BUNGE and another *v.* THE STEAMSHIP UTOPIA, etc.

ZEISMER and others *v.* THE STEAMSHIP UTOPIA, etc.

*(District Court, S. D. New York.   March 3, 1880.)*

COLLISION—IMMODERATE RATE OF SPEED—FOG.—Eleven knots an hour is an immoderate rate of speed, where the fog is so thick that vessels can only be dimly seen at the distance of a quarter of a mile.

SAME—DUTY OF STEAMER TO STOP—VESSEL IN A FOG.—A steamer should stop when uncertain as to the course of a sailing vessel by reason of a fog.

EVIDENCE—STATEMENT OF MASTER—CONTRADICTION OF TESTIMONY. A statement made by the master of a steamer before the receiver of wrecks, in pursuance of the merchant's shipping act of 1854, (17 and 18 Vict. *c.* 104,) is admissible in evidence to contradict the testimony of such master in a trial for collision.

SAME—OFFICIAL LOG.—Facts stated in an official log, made and signed by those chiefly having knowledge of the facts, must, as against the ship, be taken to be true, unless a mistake is clearly shown.

*R. D. Benedict,* for libellants.

*H. T. Wing* and *C. Van Santvoord,* for claimants.

CHOATE, J.   These suits are brought by the owners of the German bark Helios, and the owners of her cargo, to recover the value of the vessel, and her cargo of petroleum and staves, which were totally lost by collision with the steamship Utopia, on the sixth day of September, 1878.

The place of the collision is stated in the libels to have been in latitude 43 deg. 34 min. north, longitude 50 deg. 18 min. west.   The answers make the place a little further to the southward and eastward, but the difference is not material, and the place is admitted to have been on the great bank of Newfoundland, near its southern edge.

The collision took place in the day-time, a little after 5 o'clock in the afternoon.   The steamer was bound from Lon-

don to New York. She was a passenger and freighting steamship of 1,700 tons, and running in a regular line. Her length was about 350 feet. The bark was loaded with a full cargo of petroleum and staves, and was on a voyage from New York to Rotterdam.

The libels aver that the bark, when she sighted the steamer was sailing east by south, with all sails set except the studding sails, and that the wind was south-west, and that the bark was making a speed of seven miles an hour, or thereabout.

The answers aver that the wind was about south-west, S. W. by S., and blowing a good full-sail breeze. An attempt was made upon the trial, on the part of the claimants, to show that the wind, at the time of the collision, was S. W. by W. ½ W.; but by a great preponderance of the testimony it was shown that the wind was not at all to the westwardly of southwest, and this effort to show that it was so has no support in the proofs, and is in conflict with the answers. It must therefore be taken as a fact in the case that the wind was south-west.

The facts of the collision are thus stated in the libel: "The weather was very foggy, and a competent lookout was stationed on the bow, by whom three loud blasts of a foghorn continued to be blown at very short intervals, and by whom, also, a careful lookout was kept. A competent man was also at the wheel, the master was walking on the main deck, and the boatswain and a seaman were also forward, and all were listening carefully for signals, etc. At a few minutes past 5 o'clock the lookout descried through the fog the sail of a vessel right ahead, and immediately reported such sail right ahead.

"The master, hearing the report, ran to the forward deck and saw the sail ahead, and for a moment he supposed it to be a fishing vessel at anchor—that being a locality where the presence of such a vessel at anchor might reasonably be expected. On that supposition he called to the man at the wheel to put the wheel to starboard, but almost immediately, and before the order to starboard could be obeyed, he saw

that the vessel was a steamer coming almost directly upon them, but apparently changing so as to bear more towards the port hand of the bark, and thereupon, in order to co-operate as far as possible with the movement of the steamship, he ordered the helm of the bark to be put hard a-port, and her helm was at once put hard a-port. The steamer was then so near, and coming at so rapid a rate, that the course of the bark was only changed about two points under the port helm when the steamship struck her on her port side, just aft of the fore rigging, a diagonal blow, cutting in nearly to the main hatch, and causing the bark to sink so speedily that her crew barely escaped with their lives, losing everything except the clothes which they had on at the time."

The libels further aver "that the steamer was running a rapid rate of more than 11 knots an hour, and at too great a rate of speed, and without keeping as careful and attentive a lookout as should have been kept, or blowing as loud and as frequent signal whistles as should have been blown, and that she did not in time adopt and continue proper measures to keep clear of the bark by passing her on one side or the other, or by stopping and backing in time, but by changing her course as she did she ran directly upon the bark, and was otherwise carelessly navigated; that the bark was in no way in fault; that the steamer was seen as soon as it was possible to see her; that the collision was then, so far as the bark was concerned, inevitable, and that the changes of helm in the bark were only made *in extremis*, and that the only effect of them was to change the position in which the two vessels came together."

The answers allege that "at 4 P. M. the breeze was moderate, with a thick fog and a drizzling rain, clearing up at intervals; that thereafter the fog was less dense and not very thick, before and when the vessels first sighted each other; that at about 4 o'clock, there being then a dense fog, two lookouts were placed on the bow and two stationed on the forward bridge of the steamship, and the master and first and third officers were on the main bridge, a quartermaster at the wheel, and all necessary appointments made for the careful

navigation of the steamship—proceeding thence forward at a moderate rate of speed of about nine knots, and blowing her steam whistle at intervals of not more than a minute; that shortly after 5 p. m., and at about 5:10, a lookout on the bow sung out, 'A vessel ahead,' and the vessel, afterwards known to be the Helios, was seen by the officers of the steamship on the bridge, bearing as to situation nearly directly ahead of the steamship, about a quarter of a point, or less, on the steamship's starboard bow, showing her port bow, and having the wind free and all her sails (without studding sails) set, and drawing and moving at a rate of speed of about eight knots an hour, and sailing south of east, and on a course inclined to the southward of, and to pass to the southward of, that of the steamship, sailing on a course west by north, quarter north—the bark being, when first seen from the steamship, at a distance off of a mile and more, and so far off that on their respective courses there was no danger of a collision from proximity, nor any ground for apprehension of danger by persons in charge of the navigation of the bark, if ordinarily competent seamen, and minding their business; that immediately upon the observation of the bearing and the standing of the bark, as aforesaid, the helm of the steamship, for greater caution, was ordered to be and was put hard a-port, and if the bark had continued, as she should have done, on the course on which she was standing when first sighted from the steamship, and when the helm of the steamship was ordered to be put and was put a-port, as aforesaid, the two vessels would have passed—the steamship to the northward and the bark to the southward, at a proper and safe distance, and so far off that no collision could have been possible; that instead of so continuing her course, the bark, after the steamship's helm had been put a-port, as aforesaid, put her wheel to starboard and altered her course to pass to leeward of the steamship, and so as to stand across the line of direction of the steamship— this through some misconception (from careless observation or other fault on the part of the bark, as afterwards learned, but unknown at the time on board the steamship) that this great steamship was a fishing vessel at

anchor; that this making of the bark to pass to leeward being observed from the steamship, ·the latter's helm was ordered to be and was shifted to hard a-starboard, by which the course and direction of the steamship was changed to the southward, and so far to the southward, and with speed reduced by slowing and stopping her engines, that if the bark had continued on the course she was making to pass to leeward the steamship and bark would have cleared at a safe distance off, and so far off that there could not have been a collision; that instead of keeping on this last mentioned course, the bark, through want of proper seamanship, or other fault of persons in charge of her navigation, again changed, this time suddenly porting and standing on a port helm, so as to throw herself across the bow of the steamship, and in such close proximity, through the mismanagement and fault of the bark, that the collision·followed as the result of this last change, notwithstanding the use of all the precautionary measures to avoid the collision, in her power, by the steamship, on board of which, immediately upon observing this last change of the bark, the engines were reversed full speed astern; that the steamship at the time of the collision had but little, if any, headway through the water, and the bark was forging ahead on a port helm, angling across, until her port side, between the fore and main rigging, struck against the stern of the steamship, and thereby the bark was badly damaged; that the collision was caused by the want of a proper lookout on the bark, the want of proper attention to the sounding of the steamship's steam-whistle, and the mistake by the persons navigating the bark of the steamship for a fishing vessel at anchor, through their fault, and their want of proper seamanship, and the changing of the bark's course each time, after the steamship changed her course to clear the bark, so as to cross the bows of the steamship, or otherwise, through the sole fault of the master and crew of the bark, and without negligence or fault on the part of the steamship."

The Utopia is a British steamer, and by the merchant shipping act of 1854, § 282, (17 and 18 Vict. c. 104,) it is required

that there be entered in the official log "every collision with any other ship, and the circumstances under which the same occurred." By section 283: "The entries in the official log are required to be signed by the master and mate, or some other of the crew." By section 285: "All entries made in any official log-book, as hereinafter directed, shall be received in evidence in any proceeding in any court of justice, subject to all just exceptions."

In pursuance of the duty required of them by this statute the master and mate of the Utopia signed an official log, containing the following statement of this collision: "Weather thick, with rain, clearing at intervals; steamer proceeding with careful attention to the state of the weather; suddenly a ship was sighted nearly ahead, when we slowed engines and stopped; ship and steamer ported, but instantly the ship kept away, compelling the steamer to starboard; the ship at this time was dangerously close to the steamer, and a collision being inevitable the engines were reversed, full speed astern, when she suddenly ported and ran across the bows of the steamer and fell against the stern, crushing her broadside in with the force of her own impetus, and resulting in the total wreck of the bark Helios, of Pillan, Captain George Zeismer, from New York, bound to Rotterdam, laden with 2,886 barrels of petroleum, with a crew of 12 men, who were all saved by the steamer's life-boats."

The exact time when this statement was drawn up, or when it was signed, is not shown, but the act requires the entry to be done as soon as possible after the occurrence to which it relates, and in all cases not later than 24 hours after the arrival of the vessel in her final port of discharge. The testimony of the master is that in this case it was done before he reached London on his return voyage.

The libels were filed and the vessel bonded while she was in New York, and before her return to London, so that this statement of the collision was made by the master and mate of the steamship after they had an opportunity to know the allegations of the libel as to the circumstances of the collision.

The steamer left New York for London on the eighteenth of September, and arrived at London on the third day of October.

On the tenth of October, 1878, the master of the Utopia signed and swore to a statement before the receiver of wrecks, in London, which was as follows:

"On Friday, the sixth day of September, at 5 p. m., the tide at the time being unknown, the weather thick and foggy, and the wind in the south-west blowing a fresh breeze, the sea smooth, the said ship arrived off the south edge of the Grand Bank coast of Newfoundland. The vessel was in charge of deponent, who was on the bridge. T. Swain, first mate, was with deponent on the bridge; Polsen, third mate, was also on the bridge, attending to the steam-whistle, which was kept going about every two minutes; one A. B., seaman, (name unknown,) was on the bow forward, and another A. B., seaman, (name unknown) on the fore bridge, keeping the lookout. The vessel steers by steam from the bridge, the wheel being attended to by the quartermaster. The vessel was steaming about nine knots, the course being west by south, (magnetic.) Deponent and the lookouts simultaneously observed the sails of a bark, which proved to be the Helios, about right ahead, almost head on. She appeared to be about a quarter of a mile distant. Instantly, put the helm hard a-port and stopped the engines, and then reversed, full speed astern. The Helios was observed to port her helm and then instantly starboarded. Deponent then ordered his helm to be starboarded, which was instantly done, and the vessels were clear of each other. The Helios suddenly again ported her helm, and a collision became inevitable. Deponent's vessel was going full speed astern, but the Helios' port side, a little abaft the fore rigging, fell across the Utopia's stern. The Helios stove in her port side and fell over on the port side, a complete wreck."

This statement was dictated by the master, and he indorsed on the statement, in his own handwriting, and signed the following additional statement: "That, in my opinion, the cause of the casualty was the Helios improperly star-

boarding her helm, and it would have been avoided if she had kept her port helm; but, when the Helios starboarded, if she had then kept her starboard helm the collision would have been avoided. The Helios, porting her helm a second time, made the collision unavoidable."

This statement was made in pursuance of section 448 of the merchants' shipping act of 1854, (17 and 18 Vict. c. 104,) which provides that "any receiver, or, in his absence, any justice of the peace, shall, as soon as conveniently may be, examine upon oath any person belonging to any ship which may be or may have been in distress on the coasts of the United Kingdom as to the following matters, [among others:] 5. The occasion of the distress of the ship * *. 7. Such other matters or circumstances relating to such ship, or to the cargo on board the same, as the receiver or justice thinks necessary. And such receiver or justice shall take the examination down in writing, and shall make two copies of the same, of which he shall send one to the board of trade and the other to the secretary of the committee for managing the affairs of Lloyd's, in London; and such last mentioned copy shall be placed by the said secretary in some conspicuous situation, for the inspection of persons desirous of examining the same."

By section 449 it was provided that "any examination taken in writing as aforesaid, or a copy thereof purporting to be certified under the hand of the receiver or justice before whom such examination was taken, shall be admitted in evidence in any court of justice, or before any person having by law or by consent of parties authority to hear, receive and examine evidence, as *prima facie* proof of all matters contained in such written examination." By the merchant shipping act of 1876 (39 and 40 Vict. c. 80, § 45) the 449th section above cited was repealed.

The master of the steamer also drew a diagram, intended to represent the circumstances of the collision, which was produced by him upon the trial. It was drawn to a scale while he was on a voyage to New York, about a year after the event. It shows the steamer heading W. by N. $\frac{1}{4}$ N.,

when she first saw the bark, and the bark nearly one point on her starboard bow, and upon a course nearly south-east, and, of course, crossing the bow of the steamer to the southward.

Then the steamer is represented as porting, with her engines slowed and stopped, and moving ahead quite slow, making a course two points to starboard of her former course, and running one-fourth of a mile after porting, the bark meanwhile having kept on her course one-sixteenth of a mile, and then starboarding and keeping off four points to the leeward, running a quarter of a mile on this course, and then the steamer starboarding three points and running on this new course an eighth of a mile, coming into collision with the bark about head on, or at a right angle upon the port side, the bark meanwhile having ported four and a half points and run a sixteenth of a mile to the place of collision.

The witnesses on the part of the steamer, who observed the collision, were the master, the mate, and the third officer, who were on the bridge, one lookout on the bow, and one on the fore-bridge, the carpenter of the ship, and one of the quartermasters, who were not on duty, but happened to be on deck. These witnesses testify that when they first saw the bark she was nearly ahead, all but one of the witnesses other than the master putting her a little on the starboard bow. The master testified that she was right ahead, and, though pressed, refused to say that she bore at all on either bow. His diagram, however, shows her on the starboard bow, and the answer so avers. The witnesses testified that they could see her sails and her port bow; that she appeared to them to be on a course to the southward of them, crossing their bow. They vary greatly as to her distance at that time, from a quarter of a mile to more than a mile. The mate puts her more than a mile off, and the master "a good mile off." The master was on duty, and directing the movements of the ship. She was so nearly ahead that she was reported by the lookout as "ahead."

The wheel of the steamer was immediately put hard a-port, and the master testifies that he at the same time gave an

order to the engineer "to slow." Their testimony is to the effect that after the steamer had thus ported, and had brought the bark on their port bow, she suddenly changed her course by starboarding, standing across their bow again to the northward; that the master of the steamer, observing this movement of the bark, immediately changed his wheel to hard a starboard; that the steamer starboarded so as to bring the bark on their starboard bow again. The master testifies three points on their starboard bow, when the bark suddenly ported, running across their bow again, being then at a distance of about an eighth of a mile; that the order was then given to reverse at full speed, and the collision became inevitable, and thus they came together.

The master of the steamer testifies that if the bark had kept on her original course they would have cleared each other by the porting of the steamer, and would have passed each other port side to port side by an eighth of a mile. He also testified that he saw it was necessary to port in order to clear, and he did put his wheel hard a-port. He testified that if the bark had kept her course after she starboarded, and after the steamer starboarded, they would still have passed clear of each other starboard side to starboard side; that after the steamer starboarded they were in fact well clear of each other, the bark being broad off on the steamer's starboard bow; and that it was the porting of the bark in this position, and that alone, which made the collision inevitable. In this account of the circumstances of the collision he is to some extent corroborated by the other witnesses from the steamer.

On the part of the bark, the witnesses were the lookout, the wheelsman, the master, the boatswain, and one other seaman. Their story is that the weather was very thick; that the lookout sung out, "Ship right ahead;" that the master and the boatswain ran forward on to the forecastle deck. The master could see sails, and, thinking it was a fisherman at anchor, he immediately gave the order to the wheelsman to keep off. The master testifies that he looked back to see that the order was obeyed, and he saw the wheelsman beginning

to move his wheel; that he immediately looked forward again, and he saw the hull of the vessel ahead, and saw it was a steamer, and the boatswain at the same moment exclaimed that it was a steamer, and that she was keeping off; that he immediately gave the order to the wheelsman to luff—that is to starboard; that the bark had not then altered her course under the order to keep off; that there was not time to get the wheel over; that under the second order the bark luffed about two points; that he gave this order to co-operate with the steamer in her movements; that if he had kept his course the steamer would have struck the bark on the starboard quarter; that immediately after giving the second order he ordered the rest of the crew called from below, the danger was so imminent.

The testimony of the man at the helm confirms that of the master as to the movements of the wheel; that the wheel was not got over under the first order, and the course of the bark was not altered by it.

The testimony of all the witnesses from the bark goes strongly to show that the vessels were very near together when first seen; that the speed of the steamer was very great; that the time after sighting her was very short, and the succession of events very rapid. The testimony of those on the bark is positive as to her course; that it was east by south, the wind being south-west; that until she luffed, just before the collision, her course was not to the southwardly of this; that she had been keeping that course steadily till she sighted the steamer.

The first contested question of fact is as to the course of the bark before she was sighted by the steamer. I think there is no doubt that those who observed her on the steamer thought she was on a course crossing that of the steamer to the southward when they first made her. This is not only the concurrent testimony of seven witnesses, but the fact is strongly sustained by the order of the master of the steamer to put the wheel "hard a-port." Her bearing from the steamer is shown to have been a very little on the starboard bow, but nearly ahead and coming towards them, the course

of the steamer being N. by W. ¼ W. If the bark, bearing thus from the steamer, was on an east by south course, she had, in fact, already crossed the bows of the steamer, and was pointing to the leeward of the steamer, and not to the southward of her or across her bows. If such had been observed from the steamer to have been her course, the steamer's wheel would not have been put to port, a movement which tended at once to bring them upon crossing courses, involving danger of collision.

Yet I am unable to reject the positive testimony of those on the bark as to her course, if it is possible to reconcile their testimony with any probable hypothesis of a mistake in this respect on the part of those who observed her movements from the steamer; and I think it can be so reconciled. Each vessel saw the other through the fog. Whatever may have been their distance apart, (a point to be hereafter considered,) it was, at the first glimpse, necessarily very indistinct, that those on the steamer got of the bark, that they thought her crossing to the southward. It is not at all improbable that upon this first glimpse they should be mistaken as to her course. It is not at all improbable that something in the trim or appearance of her sails gave them the impression that she was crossing their course to the southward.

It is too common an optical illusion to excite either remark or surprise that when the eye catches some object in an imperfect light, or indistinctly through a fog, the image conforms itself more or less in detail to what it seems to be as suggested by some one feature which the observer, for the instant, thinks he makes out. Thus, it is to be expected that if there was something which gave the impression of the bark's standing to the southward, it should also seem to those observing her that they made out the port bow, or saw along her port side, as they testify, with more or less positiveness, although this impression as to details may indeed merely be a trick of the memory, or the imagination working in aid of the impression they had at the time that the bark was standing across their course to the southward, it is the

nature of such an optical illusion that it vanishes suddenly, and the object, mistaken before, is suddenly seen as it really is. And that was so in this case. Suddenly they observed that she had fallen off to the northward. They attributed this to her having starboarded.

This is exactly what they would seem to see as they came nearer, if they had mistaken her course at first, and they represent it as a sudden and a marked change, from pointing to the southward of them to pointing to the leeward or northward of their course; from seeing her port bow and side to seeing her starboard bow and side. Yet it is certain, the bearing of the bark from the steamer and the course of the steamer being fixed, that the bark was not pointing across the bows of the steamer at this time, if her course was east by south. And the change in her wheel upon the first order given is not sufficient to account for this apparent change as observed from the steamer, if any credit is given to the testimony of those on the bark, for the following reasons: *First*, because it was not a change from a course crossing the bows of the steamer to a course to leeward of the steamer, but, if anything, a change from a course to leeward to a change a little more to leeward of the steamer; and, *secondly*, because the change of the wheel was not, upon the testimony, such as altered the course of the bark at all. Further confirmation of this view is, I think, to be found in the fact that the imagination of the master of the steamer created in his mind the idea, to which he for some time adhered, that the first movement of the bark, as he first dimly saw her through the fog, was her porting before she starboarded.

It is true that in giving his testimony on the trial that idea was entirely given up, and he was disposed to repudiate the sugestion that he had ever entertained it, yet the fact was positively asserted by him and the mate in the official log, and by him again in his examination before the receiver of wrecks.

The bearing and importance of these papers as evidence will be hereafter considered, but with reference to the present point it is only necessary to observe that whereas it is now conceded and certain that the bark did not port when first

seen, it is equally certain that the master of the steamer, on or about the third of October, in his official log, and on the the tenth of October, in his examination—both within little less than a month after the event—declared in the one case, and swore in the other, that she first ported and then starboarded.

I am unwilling to accept the view that this alleged porting of the bark was a mere fabrication of the master and the mate to account for and justify their first movement of porting, which, upon what is now shown to be the real course of the bark, was a mistake.

When the official log and the examination were signed, the master may be presumed to have known, from the libels filed before the Utopia left New York, that the bark had been upon an east by south course. This being positively given as her course in the libel, and there being no reason why she should not, with a south-west wind, hold such a course until she sighted the steamer, and the impression of the master of the steamer being positive that when he gave the order to hard a-port the bark was going to the southward of him, it was a natural conclusion of his mind that she must have ported in order to be standing across his bow when he gave that order.

This notion of the bark porting may thus have had its origin in what the master knew was the claim of the bark as to her course, and what he observed as to her course when he gave that order, and may have been a conclusion of his mind, working towards a possible reconciliation of these facts. So strong must have been the impression, then, that she ported, that in the official log he and the mate actually make the starboarding following that movement of the bark, which proves to have been purely imaginary, the real cause of the collision; for the official log distinctly states that when, in consequence of that movement, the steamer was compelled to starboard, the collision was already inevitable. This idea had become modified when he was examined before the receiver of wrecks, for there, while he still adheres to the first porting of the bark, he takes great pains, apparently, by a postscript, to point out

that, in his opinion, the collision did not become inevitable until the bark ported the second time.

Without noticing here the gross contradictions between these two official statements, and between each of them, and the testimony of the master and the mate, it is enough to observe, as bearing on the question now under consideration, and the probability of those on the steamer being mistaken in their first dim observation of the bark through the fog, that the view which they got of her must indeed have been indistinct and uncertain, if the impression of it on their minds was so plastic that their imaginations, working on that impression so soon after the event, can have created the positive belief in their minds of a movement of the bark by porting, which supposed movement proves now to have been a mere creation of the imagination, or a conclusion of what they thought must have been done from what they also thought they saw being done. What reliance can be placed upon optical impressions so plastic and unreal, so little fixed and certain, so susceptible of shifting appearances?

Assuming, then, that the course of the bark, when first seen, was east by south, and that she was not crossing the bow of the steamer, but was pointing, though at a very slight angle, to leeward of her, the next point in dispute is the speed of the steamer. It is claimed on the part of the bark that the steamer was running at a speed of $11\frac{1}{2}$ knots an hour. The steamer admits about nine knots. On this point the preponderance of the testimony is against the steamer.

It is true that the witnesses from the steamer testify to their opinions that the speed she was making was eight and a half or nine knots, but such evidence is of little value if based on mere observation of the progress of the vessel through the water.

The master, however, testifies that the telegraph, up to the time the bark was sighted, stood at "full speed ahead," and on this point the chief engineer says her utmost speed, under steam alone, was $11\frac{1}{2}$ to 12 knots. She was carrying her fore try-sail, main try-sail, fore stay-sail and jib—all large

sails—and they were full and drawing. The sea was smooth. The master testified that these sails were carried merely to steady the ship, and he thought they gave her no increase of speed.

The opinion of another witness, a competent expert, was that they would give her, at least, an additional knot and a half an hour.

The fog had set in about noon. There was no evidence of any order whatever being given to slacken the speed after the fog set in, and before the bark was sighted.

But the chief engineer was called, and testified that after the fog set in they used coal from a particular bunker, which, he says, contained inferior coal, and that the engine was not making the full number of revolutions required for full speed.

But the testimony of this witness, under the circumstances, seems to me not sufficient to prove the inferiority of the coal to an extent that would so largely reduce the speed of the steamer. The witness is not shown to be an expert in the quality of coal. No other evidence is produced to the fact, although if true it might be produced. And if the engineer thus allowed the speed to run down, or purposely took measures to produce that result, he was acting in direct violation of the order from the bridge, which stood at "full speed ahead." Moreover, he testifies to the number of revolutions from memory merely, though he was examined more than five months after the collision, and although he kept a log in which the number of revolutions was noted, which was neither produced nor used to refresh the recollection of the witness at or before his examination. Nor was the assistant engineer, who was on watch, examined as a witness.

Aside, however, from the evidence given in the case touching this question of speed, there has been, in the course of the trial, such an evident suppression of testimony on the part of the steamer that all presumptions are on this point against her.

The mate of the steamer was examined before the trial, in New York, in February, 1879. On his direct examination he testified that the speed of the steamer was about eight and

one-half knots. On his cross-examination it appeared that the ship's log contained an entry as to her speed, signed by him and the master; that this entry was made from the report of the quartermaster. The libellant's counsel called upon the claimant's counsel to produce the ship's log, in order that the witness might be examined in reference to this entry. This request was refused, although the log was shown to be in New York, and accessible. This refusal to produce a contemporaneous record, made by the witness himself, in the course of his duty, when the same was required, lost the accuracy or good faith of his statement on direct examination, which tended strongly to exonerate his side of the case, on a critical point in dispute between the parties, will admit only one construction, and that is that if the log had been produced it would not have aided the steamer's case.

There is also evidence that one of the quartermasters not called was charged with the duty of ascertaining the speed of the ship by throwing the log, and the result of his observation was noted in what was called the "scrap log." This scrap log was called for by the libellants on the trial, but not produced, the non-production being excused by want of sufficient notice; but the fact is uncontested that a constant observation and noting of the speed were made on board the steamer, and yet only the most uncertain evidence of speed, from the estimate and judgment of the witnesses, was produced, and the evidence which could alone have afforded a reasonable degree of certainty—if, in fact, she was not going at full speed—was not produced, or was suppressed.

Further confirmation of the fact that the steamer was making at least 11 knots an hour is to be found in the computation minuted by the master on his diagram, in which, in laying down the course and movements of the steamer, he estimated her average speed, while under her hard a-port wheel, to be 10 knots, although his diagram indicates that, at the same time that he ported, he stopped his engines, and his testimony indicates that he gave the order to slow the engine at the time that he ordered the wheel hard a-port.

The next question to be determined is the distance the ves-

sels were apart when they first came in sight of each other. On this point there is a very great conflict between the testimony from the bark and the testimony from the steamer, but no substantial conflict between the testimony from the bark and the official log signed by the master and mate, and the examination dictated and sworn to by the master before the receiver of wrecks.

The witnesses from the bark estimate the distance at three or four ship's lengths. The captain of the bark puts it at a cable's length and a half, which would make it 1,100 feet. The master of the steamer says "a good mile." The mate says more than a mile, and he swore that vessels could be seen two miles off. Most of the witnesses from the steamer refused to give any judgment by ship's lengths, or by the steamer's lengths, and their estimates vary greatly. The statement of the collision in the official log, it seems to me, strongly confirms the case of the bark that the distance was very short and the succession of events up to the collision very rapid. Thus, it says: "Weather thick, with rain; clearing at intervals; steamer proceeding with careful attention to the state of the weather; suddenly a ship was sighted nearly ahead," etc.

The use of the word *"suddenly"* in this connection shows that the appearance was unexpectedly near; that it came upon them suddenly.

It necessarily suggests that they found themselves in close quarters with her. It is not such an expression as would be likely to be used if she were a mile or half a mile away. It goes on: "When we slowed engines and stopped, ship and steamer ported, but instantly the ship kept away, compelling the steamer to starboard. The ship, at this time, was dangerously close to the steamer, and a collision being inevitable the engines were reversed," etc. As we have seen, the porting of the ship was a mistake. The apparent keeping away of the ship was merely their first accurate observation of her course, which did not take place till after the steamer ported, and which must have been immediately after the steamer ported, because the rapid movement of both out of the

fog towards each other would leave time only for a momentary delusion. And so the log says, with reference to the porting of the steamer, "*instantly*" the ship kept away. The star-boarding of the steamer is represented as immediately following on this movement of the ship, and the vessels were already in instant peril of an inevitable collision.

Nothing can be plainer than that this official log makes the distance very short, and the time very brief, from the point where the ship was observed to be on her east by south course to leeward of the steamer's course, to the collision. The first orders given on the steamer also show that the distance was very short. The orders were "*hard a-port*" and "*slow.*"

Why should the wheel have been put *hard a-port*, especially if, at the same time the steamer slowed, the approaching ship being but a quarter of a point on the starboard bow, and, as then observed, making a course to the southward of the steamer's course, if she were a mile, or even a half a mile, off? The answer, as if anticipating this criticism, characterizes the movement as made "for greater caution." It was indeed, if true, upon the relative positions of the vessels as given by the steamer, extreme caution, and so much so as to suggest in itself a serious doubt as to the truth of the case she makes. At the distance apart of a mile, a comparatively slight porting of the wheel would have been all that was required, if anything, to clear the bark, her movement being all the time to the windward of the steamer's course.

But the master of the steamer is not only contradicted on this point by the necessary inferences to be drawn from the official log, and by the probable inferences to be drawn from the measures he took on seeing the bark, but in his examination before the receiver of the wrecks, dictated by himself, he expressly states the distance: "She appeared to be about one-fourth of a mile distant. Instantly put the helm hard a-port," etc.

It is claimed, on the part of the steamer, that this document is not competent evidence in the cause. This is so. The statute making it admissible has been repealed, and,

moreover, I do not see that the statute required the statement of the circumstances of the collision to be made in any case before the receiver of wrecks, and the requirement of any such statement seems to be limited to vessels that fall into distress upon or near the coasts of the United Kingdom. See statutes above cited. See, also, *Nothard* v. *Pepper*, 17 C. B. (N. S.) 39; *The Henry Coxon*, L. R. 3 P. D. 156; *The Little Lizzie*, E. L. R. 13 Ad. Rec. 56.

But, conceding all this, the statement is still competent evidence to contradict the testimony of the master, and to show that he has made statements of the circumstances of the collision conflicting, on the most vital points, with his testimony given upon the trial.

In this view this document *destroys* entirely his testimony as to the distance of the two vessels apart when first seen. Upon the whole evidence, I have had no difficulty in reaching the conclusion that the vessels were not more than a quarter of a mile apart when they first made each other dimly through the fog. It is unnecessary to refer in detail to all the evidence relied on and discussed by counsel as bearing on this question. On the part of the steamer it is claimed that both vessels swung further on their changes of wheel than is consistent with this view. But there is much the same element of uncertainty in these estimates of the number of points a vessel swings to port or starboard—either the vessel on which the witness stands or the vessel he is watching—that there is about the judgment of distances and periods of time.

The evidence relied on is mostly of this uncertain character. The attempt to fix with certainty the number of points that the steamer swung to starboard under her hard a-port wheel, and to port under her hard a-starboard wheel, by the evidence of the wheelsman, is a good deal weakened by the fact that he could not give the heading of the steamer after either change, but only had a recollection of the number of points she changed. At any rate, I think his testimony is not sufficient to outweigh the great preponderance of the proof, otherwise in favor of the bark. The movements of

the bark and the testimony of her witnesses strongly corroborate the official log as to the suddenness and close proximity in which the vessels appeared to each other, and the imminence of the danger from the beginning. Measuring the time and the distance by what was actually done on both vessels, and the time required to do it, and by the speed of the vessels as they approached each other, the distance of a quarter of a mile, and a minute or less in time, will most perfectly account for and harmonize with the proved facts of the collision.

It is proved, among other circumstances, that the sails of the bark were full when she struck. This would have been impossible if she luffed so much, as is claimed on the part of the steamer. The next question is whether the collision was already inevitable when the bark luffed. If, as testified to by those on the steamer, she was then three points on the starboard bow of the steamer, and an eighth of a mile away, clearly the collision was not inevitable, and the bark, being already clear of the steamer, threw herself directly in the way of danger. The luffing of the bark can be justified only, if at all, on the ground that it was *in extremis*; that either the collision was already inevitable, and the movement of the bark only changed the place and direction of the blow, or that she had been brought into such a position of extreme peril by the fault of the steamer, and the danger of collision was so great, if she kept her course, that the error of judgment, if it was one, in luffing to avoid the peril, was pardonable. *The Bywell Castle,* E. L. R. 4 P. D. 219.

The latter alternative I do not find it necessary to determine, because there is proof enough that when the bark ported the collision was inevitable. This question is, of course, very closely connected with the question of the distance at which the vessels sighted one another, and the question how far they swung from their respective courses on their changes of wheel. The master of the steamer testifies that if the bark had kept on her course to the southward, across his bow, and the steamer had kept on her course with her hard a-port wheel, they would have gone clear and passed

each other at a distance, as he judged, of an eighth of a mile. As he was entirely mistaken in respect to the course of the bark when he put his wheel hard a-port, his testimony does not show us how far apart he thinks they would have passed, the bark being upon the course she was on, to the leeward, as he afterwards discovered she was. But he and the mate have answered that question in the official log, where they say, "but instantly the ship kept away," which, as we have seen, is to be interpreted as meaning, in the light of the facts, that "the ship was seen to be on a course to leeward;" and they say of this "keeping away" of the ship: "The ship kept away, compelling the steamer to starboard. The ship at this time was dangerously close to the steamer, and, a collision being inevitable, the engines were reversed, full speed astern, when she suddenly ported," etc.

It was the judgment of the master of the bark that if he had kept his course, instead of luffing, the steamer would have struck the bark on the starboard quarter. His judgment at the time is thus confirmed by that of the master and mate of the steamer when they signed the official log so soon after the collision.

The learned counsel for the claimants have made very light of this official log as evidence, and the master himself has, upon the trial, treated it as a mere formal matter, a document of no consequence, a statement of the collision which was near enough to the truth for the purpose for which it was made. I cannot so regard it. Great importance, it seems to me, has been given to the official log by the merchant shipping act. It is expressly made evidence in any court, subject to all just exceptions. The compliance with the statute requiring it to be made is enforced by penalties, and it seems to me that facts stated in it must, *as against the ship*, be taken to be true, expressly where it is made and signed by those chiefly having knowledge of the facts, unless a mistake is clearly shown.

The case cited to show that the log is not competent evidence has no application. That was a case in which the

entry in the log made by a deceased mate was offered as evidence *for the ship. The Henry Coxon, ut supra.*

It is argued that the act only requires a statement of the fact of collision, the names of the vessels, the time, whether day or night, and the casualties attending it. This, it seems to me, would be a very narrow construction of the words "circumstances under which the same occurred," and I see nothing in the cases cited as limiting the construction of the act.

In the present case it is inconceivable that the master and mate should admit in this document, which was drawn up by the master's dictation, that the collision was inevitable before the bark ported, unless that was in fact their judgment at the time. They had every inducement to state their case as favorably for their steamer as their partial judgment of the facts would allow, and yet, knowing that the bark changed her course just before the collision, and knowing also that this was a fatal fault if not *in extremis*, they say explicitly that the collision was inevitable when she ported, and charge the collision to her fault in first porting, and then, after the steamer had ported to conform to that movement of the bark, suddenly, and in violation of the rules of navigation, starboarding.

This concurrence of those in charge of both vessels ought to be conclusive on the court. There is, however, in the evidence, other confirmation of the judgment thus expressed by the officers of both vessels. The order to luff was given because the master of the bark saw that the steamer was falling off; that is, going to leeward under her port wheel. If the order to put the wheel hard a-starboard had been given on board the steamer when the order to luff was given, there was certainly nothing in the movement of the steamer, as seen from the bark, to indicate that her wheel was changed. The starboarding of the steamer and the luffing of the bark must have been, therefore, almost simultaneous, and not in the order testified to by those on the steamer, who put the luffing of the bark after the steamer had got fairly on her course to windward under her hard a-starboard wheel, which

would be a maneuver on the part of the bark so absurd as to be proved only by a very great weight of concurring testimony.

The steamer, by putting her wheel hard a-starboad, virtually admitted that it was too dangerous to keep on across the bows of the bark while she was going to leeward, and this movement of the master of the steamer strongly confirms the judgment of the master of the bark that if both the vessels had kept on the bark would have been struck on the starboard side. If, as may be properly assumed, the situation was so urgent, as the master of the steamer understood it, as to require him to put his wheel hard a-port when he first saw the bark, the danger of collision must have been many times greater when, to escape a collision by persevering in that course, he changed his wheel to hard a-starboard. The vessels were much nearer together, and the swing of the steamer to starboard had to be broken before she would begin to swing to port. If the vessels were very near together, as seems to have been the case, the tendency of the movement was to bring the steamer directly down on the bark.

Many other parts of the testimony have been commented on by the counsel as bearing upon the disputed questions of fact. It would prolong this opinion too much to notice them in detail. They have all been considered with care in reaching the foregoing conclusions.

The fault was clearly on the part of the steamer. With a fog so thick that vessels could only be dimly seen at a quarter of a mile, she was running at a speed of over 11 knots an hour. This was not that moderate rate of speed which the rules of navigation require. This was the primary and chief cause of the collision. When the vessels first sighted each other each made a mistake in respect to the other. The bark took the steamer to be a sailing vessel, and the steamer mistook the course the bark was on. This mistake of the steamer, cannot, in *itself,* be accounted as a fault. But the steamer was in fault, considering her immoderate speed and the nearness of the bark, and the indistinctness with which she could be seen, in not at once stopping. By merely slowing, instead

of stopping, she was brought so "dangerously close" to the bark, as the official log states, when she discovered her mistake, that the collision was then inevitable. The bark did not change her course to port by the first movement of her wheel. That movement of her wheel, if it had had some slight effect, would have been excusable, because the vessel ahead did not appear, at the time, to be a steamer, and the fog was so dense that she could not be made out. The luffing of the bark was *in extremis*, and after the collision had become inevitable by the fault of the steamer.

Decrees for the libellants, with costs, and references to compute damages.