**RUBICON CHEMICALS, INC.**

v.

**ARKWRIGHT–BOSTON MANUFACTURERS MUTUAL INSURANCE COMPANY, and/or Factory Mutual Liability Insurance Company.**

Civ. A. No. 77–240–B.

United States District Court,
M. D. Louisiana.

Dec. 2, 1980.

Michael A. Britt, Leach, Payssee & Baldwin, New Orleans, La., for plaintiff.

John I. Moore, Taylor, Porter, Brooks & Phillips, Baton Rouge, La., John N. Love, John C. Hart, Lawrence Zelle, Robins, Davis & Lyons, Minneapolis, Minn., for Arkwright–Boston Manufacturers Mutual Insurance Co.

---

Alexander C. Cocke, Jr., New Orleans, La., for Factory Mutual Liability Insurance Company of America.

POLOZOLA, District Judge.

On August 14, 1975, an explosion occurred at the Rubicon Chemicals, Inc. (Rubicon) plant in Geismar, Louisiana which caused considerable damage to a Nitric Acid Absorber Tower. As a result of this explosion and the resulting property damage and business interruption loss, Rubicon recovered payments from various insurance companies which totalled $2,622,542. Rubicon now seeks to recover this sum from Arkwright–Boston Manufacturers Mutual Insurance Company (Arkwright–Boston) on behalf of the insurance companies which have previously paid Rubicon for its loss.

The Court has jurisdiction herein pursuant to 28 U.S.C. § 1332.

Plaintiff contends that Arkwright–Boston issued to Rubicon a policy of insurance which provided coverage for business interruption loss. It is plaintiff's contention that Rubicon is entitled to recover from Arkwright–Boston any sums paid to Rubicon for business interruption loss as a result of the explosion that occurred on August 14, 1975 in the Nitric Acid Absorber Tower. Plaintiff further contends that the exclusion set forth in the Arkwright–Boston policy for "explosion of" an unfired pressure vessel is inapplicable under the facts of this case.

As a result of the August 14, 1975 explosion, Rubicon received payments from various insurers, including Bellefonte Insurance Company, Northbrook Insurance Company, and certain Lloyds interests. Rubicon Chemicals, Inc. gave a loan receipt to Bellefonte Insurance Company, which paid Rubicon $196,690.65 as its portion of the business interruption loss. This loan receipt gave Bellefonte Insurance Company the specific right to pursue recovery for the amounts paid Rubicon in the name of Rubicon. Rubicon filed this suit on July 11, 1977. After this suit was filed, the Lloyds interests and Northbrook Insurance Company also sought to pursue their claim for payments made by the Lloyds interests in the sum of $2,360,-287.80 and by Northbrook Insurance Company in the sum of $65,563.55. The Court granted plaintiff leave to amend its suit to include these amounts in July of 1978. Arkwright–Boston denies that the policy it issued to Rubicon covers the claim for business interruption loss which Rubicon has asserted in this suit. Arkwright–Boston contends that when its policy of boiler and machinery insurance was originally issued in 1966 to Rubicon, Rubicon had obtained a policy of fire and extended coverage insurance from the Factory Insurance Association (FIA). The FIA policy provided coverage for explosion damage to unfired pressure vessels. Arkwright–Boston contends that it was the express intention of both Rubicon and Arkwright–Boston that the defendant's policy would not provide coverage for explosion damage to unfired pressure vessels such as that which occurred at Rubicon's plant on August 14, 1975. Because Rubicon had expressed its intention to avoid double coverage of explosions to unfired pressure vessels, and to avoid paying double premiums for such coverage, the policy issued by the defendant included Endorsement No. 3 which excluded coverage for explosions of unfired pressure vessels. Arkwright–Boston further contends that in 1975 Rubicon transferred its business interruption coverage under the FIA policy to a new bloc policy providing Difference In Conditions coverage issued jointly by underwriters at Lloyds, Northbrook Insurance Company and Bellefonte Insurance Company. At the time these policies were issued in 1975, Arkwright–Boston contends that it was the mutual intention of both Rubicon and the three insurers issuing the block policy that the block policy would provide the full scope of business interruption coverage which had formerly been provided under the FIA policy, including coverage for explosion damage to unfired pressure vessels. Thus, Arkwright–Boston contends that at the time of the Nitric Acid Absorber Tower explosion on August 14, 1975, the FIA policy provided property damage coverage and the bloc policy provided business interruption coverage for that explosion

and defendant's policy provided no coverage for the explosion. Arkwright–Boston also asserts prescription as a defense to plaintiff's amended suit which seeks to recover payments made by Lloyds and Northbrook. Finally, Arkwright–Boston questions the right of Rubicon to bring this suit on behalf of Lloyds and Northbrook.

After carefully considering the evidence presented in this case, the Court finds that the policy issued by Arkwright–Boston does not provide coverage for business interruption loss which resulted from the explosion which occurred on August 14, 1975.

In the Pre–Trial Order which was filed in this case, the parties have agreed and stipulated to the following findings of fact:

"Rubicon Chemicals, Inc. is a Louisiana corporation authorized to do and doing business in the State of Louisiana with its principal place of business at Geismar, Louisiana. At this location it owns and operates a chemical processing plant including operation for the production of nitric acid. Defendant Arkwright–Boston Manufacturers Mutual Insurance Company is and was a Massachusetts corporation authorized to do and doing business in the State of Louisiana.

On August 14, 1975, plaintiff Rubicon Chemicals, Inc., at Geismar, Louisiana, was insured under various policies of insurance, including the following policies:

A. Factory Insurance Association (FIA) Insured Rubicon under a fire and extended coverage policy covering damage to property at the Rubicon Geismar Plant.

B. A Manuscript to 'Bloc' policy issued jointly by Underwriters at Lloyds, the Northbrook Insurance Company and the Bellefonte Insurance Company, which policy provided business interruption coverage. The 'Bloc' policy apportioned the liability between Underwriters at Lloyds, Northbrook Insurance Company and Bellefonte Insurance Company in the following percentages:

| | |
|---|---|
| Underwriters at Lloyds | 90% |
| Bellefonte | 7½% |
| Northbrook | 2½% |

C. Arkwright–Boston Manufacturers Mutual Insurance Company (Arkwright–Boston) insured Rubicon under a policy of boiler and machinery insurance which provided property damage and use and occupancy coverage, subject to certain exclusions contained in the policy.

Immediately prior to August 14, 1975, Rubicon's nitric acid plant produced a 65% solution of nitric acid by a conventional process of burning ammonia gas with air on a platinum gauge catalyst. The gas which resulted from the burning of the ammonia contained nitrogen oxide which was cooled and introduced with air at the base of an absorber tower.

The nitric acid absorber tower is a cylindrical unfired pressure vessel approximately 11 feet in diameter and approximately 130 feet high. The shell of the absorber tower was made of stainless steel and designed for a maximum operating pressure of 125 p.s.i.g. The interior of the vessel contained 46 perforated stainless steel trays which were attached at uniform intervals from the top to the bottom. The water introduced at the top of the vessel would flow down from tray to tray in a step down fashion. The process of making nitric acid occurred in the absorber tower. The air and oxides of nitrogen which were introduced at the base of the tower flowed up the tower through the perforations in the stainless steel trays. Water and weak nitric acid were introduced at the top of the tower and gradually flowed down through the tower from tray to tray in a step down fashion while reacting with the gases, thus forming nitric acid. At each tray the liquid would react with the gas to produce nitric acid of increasing strength and liquid flowed to the bottom of the tower.

Because of the reaction of the water and nitrogen oxides, considerable heat was produced. This heat produced by the reaction of the water and nitrogen oxide was cooled at the level of each tray

through a series of coils which carried cold water through the vessel. The entire tower contained a total of approximately 600 such cooling coils located in various levels.

After the gas reached the top of the tower it was transported through a long section of pipe to a direct fired heater which injected natural gas into the gas stream. Hydrogen was also injected in the gas stream at this point and the mixture of gases were then fed into a unit known as a catalytic combuster which contained alumina pellets with a platinum/paladium catalyst on the surface. The reaction of the catalytic combuster was to burn the natural gas and hydrogen in the presence of the catalyst, thus removing any nitrogen oxides from the exhaust to prevent air pollution.

At 3:00 a. m. on August 14, 1975, the nitric acid storage tank of Rubicon Chemicals was full and the operations of the nitric acid plant were shut down by a standard procedure known as "A trip". This resulted in an automatic shutdown of the plant which was to include the closing of a valve on the hydrogen gas line. However, on August 14, 1975, a small metal flake became lodged in the valve preventing a complete closure of the valve and permitting the flow of hydrogen into the system. Hydrogen gas leaked through the valve into the system for several hours and eventually a substantial amount of hydrogen gas entered the absorber tower and mixed wth [sic] air in the tower. At some point on the morning of August 14, 1975 an explosive mixture of hydrogen and air existed in the tower and by 8:09 a. m. this mixture exploded.

As a result of the explosion, or explosions which took place, all but two of the 46 stainless steel trays had to be replaced. Of the 600 cooling coils 568 were also either repaired, replaced or plugged. Ultimately the shell was cut into thirteen 'cans' for the purposes of shipping the tower to Houston for repair. Eight of these 'cans' or sections were reused while five of the sections were replaced. The

repairs took approximately six months to complete. Factory Insurance Association, the property damage insurer, paid Rubicon $710,326.95.

Immediately following the loss of August 14, 1975, Rubicon notified all insurers and various adjusters and experts for all the insurance companies, made investigations at the Rubicon plant, along with an exhaustive investigation conducted by Mr. Wayne Anthon, Chief Engineer for Rubicon. As a result of the various investigations, it was concluded that there had been a leakage in the hydrogen valve which allowed hydrogen to enter the absorber tower and a hydrogen explosion occurred.

Following the investigations and adjustment of the loss, the FIA paid Rubicon $710,326.95 for property damage. FIA is not a party to the present litigation. Arkwright–Boston denied coverage contending that damage and losses were the result of the explosion of an unfired pressure vessel, which was excluded by their policy. Underwriters at Lloyds, Northbrook and Bellefonte paid Rubicon a total of $2,622,542.00 for business interruption damages. In exchange for a payment under the 'bloc' policy in the amount of $196,690.65 Bellefonte Insurance Company obtained a loan receipt from Rubicon Chemicals, Inc. under which Bellefonte Insurance Company was appointed as agent and attorney in fact of Rubicon with full powers to collect, enforce, release or otherwise dispose of the claim through attorneys of the insurance companies own selection.

Suit was filed by Bellefonte in the name of Rubicon Chemicals, Inc., as per the loan receipt on July 11, 1977, seeking the sum of $196,690.65, the amount paid to Rubicon by Bellefonte Insurance Company. Thereafter, suit was amended in July, 1978, approximately two years and eleven months after the incident of August 14, 1975, to increase the amounts of damages claimed from $196,650.65 to $4,300,000.00. The correct amount claimed should be the amounts paid by

the insurers for business interruption loss in the total sm [sic] of $2,622,542.00."

■ After carefully reviewing the entire record in this case the Court finds that the explosion which occurred on August 14, 1975 was an explosion of an unfired pressure vessel and, therefore, under the very clear language set forth in Endorsement Number 3 to the Arkwright–Boston policy, Arkwright–Boston's policy does not provide coverage for the claims sought to be recovered by Rubicon in this case. The Court further finds that even if the language in the policies was not clear, the evidence in this case clearly shows that the parties intended that the Arkwright–Boston policy exclude coverage for the type of occurrence which occurred in this case.

Endorsement Number 3 to the Arkwright–Boston policy provides in pertinent part as follows:

"In consideration of the reduced premium for which this policy is written, it is hereby agreed that the company shall not be liable for payment of any loss caused by:

EXPLOSION OF:

3. Unfired pressure vessels . . ."

The key question which the Court must decide is whether or not the language set forth in Endorsement Number 3 applies to the type of explosion which occurred in this case. In other words, the issue before the Court is whether or not there was an "explosion of" an unfired pressure vessel in this case. Plaintiff contends that in order for this exclusion to apply, there must be a rupture or bursting of the shell of the container where the explosion occurred in order for the exclusion to be applicable. Since the shell of the tower did not burst or rupture, the plaintiff asserts that the exclusion is not applicable and the defendant should be liable for the business interruption loss sustained in this case. The Court cannot accept plaintiff's contentions. The Court finds that it is the explosion itself and not the resulting damage to the shell or lack thereof which triggers the applicability of the exclusion set forth in Endorsement Number 3. None of the parties contest the fact that an explosion occurred. It is obvious from the evidence presented in this case that there was an explosion which caused considerable damage at the plaintiff's plant. The conclusion reached by the Court is supported by the jurisprudence. Thus, in *Pre–Cast Concrete Products, Inc. v. Home Insurance Company,* 417 F.2d 1323 (7 Cir.1969), a case relied on by both parties, the Court stated:

" . . . [A]n explosion includes an occurrence where great and expanding pressure is suddenly released. It is the violent expansion itself which constitutes the explosion, and none of the above authorities limit the occurrence of such expansion to the inside of a container. Thus, the ignition of an uncontained combustible material, such as a plastic explosive or gun powder, would cause an explosion since there would be a sudden and great increase in pressure, and expansion, in the area surrounding the ignition." 417 F.2d at 1326.

The Louisiana Courts have also defined the term explosion, as that term is used in an insurance policy. Thus, in *Levert–St. John, Inc. v. Birmingham Fire and Casualty Company,* 137 So.2d 494 (La.App.1961) the Court defined the term "explosion" as follows:

" . . . 'a violent bursting or expansion, with noise, following the sudden production of great pressure, as in the case of explosives, or a sudden release of pressure, as in the disruption of a steam boiler; . . .' * * * . . . The term 'explosion' has no fixed and definite meaning either in ordinary speech or in law. It may be described, in a general way, as sudden and rapid combustion causing violent expansion of the air and accompanied by a report. * * * . . . Explosion varies in degrees of intensity, in the vehemence of the report; the rapidity of the combustion; the violence of the expansion. The vehemence of the reports vary in intensity as often as the occurrence is multiplied. Hence, an explosion is an idea of degrees, and the true meaning of the word in each particular case must be settled, not by any fixed standard, or accu-

rate measurement, but by common experience and notions of men and matters of that sort. The term is to be construed in its popular sense, and as understood by ordinary men, and not by scientific men. It may be described in general as a sudden and rapid combustion, causing a violent expansion of the air, and accompanied by a report." 137 So.2d at 499–500.

The Louisiana Courts have also accepted the standard dictionary definition of "explosion" and have generally cited Webster's Third New International Dictionary, unabridged, 1961, which defines "explosion" as: "a violent expansion or bursting that is accompanied by a noise and is caused by a sudden release of energy from a very rapid chemical reaction, from a nuclear reaction or from an escape of gases or vapor under pressure."

Applying the legal standards set forth above to the facts of this case, the Court finds that there was an explosion and under the facts of this case the exclusion set forth in Endorsement Number 3 to the Arkwright–Boston policy is applicable herein.

■ Although the Court has found that under the very clear language of Endorsement Number 3 to the Arkwright–Boston policy as applied to the facts of this case that there is no coverage, the Court also finds that both Rubicon and Arkwright–Boston intended that there be no coverage under the facts of this case. It is well settled that a contract of insurance is a law between the parties. It is a voluntary agreement and the parties may incorporate therein such provisions and conditions as they see fit. It is the duty of the insurer to clearly express any exclusions or limitations on his contractual obligation. *Corkern v. Maine Insurance Company*, 268 So.2d 138 (La.App. 1 Cir. 1972). The intent of the parties in construing the contract is to be determined by the words of the contract when these are clear and explicit. *Zurich Insurance Company v. Bouler*, 198 So.2d 129 (La.App. 1 Cir. 1967); *Union Bank v. Roy*, 248 La. 801, 182 So.2d 319 (1965). Parol evidence may not be admitted against or beyond what is contained in the language of the contract unless there is ambiguity or the intent of the parties cannot be ascertained from the four corners of the document. *White v. Rimmer and Garrett*, 340 So.2d 283 (La.1976); Louisiana Civil Code Article 2276.

The Court has previously held that the language set forth in the insurance contract issued by Arkwright–Boston to Rubicon clearly and specifically excludes coverage for the damages sought to be recovered under the facts of this case. However, assuming in the alternative that the contract of insurance issued by Arkwright–Boston is ambiguous and that the intent of the parties cannot be ascertained from the language of the insurance contract, the Court must still find that Rubicon and Arkwright–Boston did not intend for the insurance contract issued by Arkwright–Boston to cover the damage claims which are at issue in this case. Because the Court has determined in the alternative that the language in the insurance contract is ambiguous, the Court may consider parol evidence to determine the intent of the parties to the contract. The parties to the insurance contract in this case are Rubicon and Arkwright–Boston. When the Court considers Rubicon's overall insurance program, the policy negotiations which took place in setting up the insurance program and the testimony of Rubicon officials regarding the intent of coverage to be provided by the insurance contracts, the Court must find that Rubicon and Arkwright–Boston did not intend for the policy which was issued by Arkwright–Boston to provide coverage herein. In fact, the testimony of Rubicon's officials clearly shows that Rubicon did not intend for the Arkwright–Boston policy to provide coverage herein. Rubicon is merely bringing this suit as a nominal party on behalf of other insurance companies who were not parties to the negotiations leading to the insurance contract entered into between Rubicon and Arkwright–Boston. The Court believes that the intent of Rubicon is binding herein and the insurance companies for whom Rubicon now brings this suit should not be able to change the

intent and meaning of the contract which Rubicon in good faith negotiated with Arkwright–Boston. In other words, Rubicon did not intend at the time it entered into the contract with Arkwright–Boston that the policy issued by Arkwright–Boston should cover the damage sustained in this case. During the course of the trial, the testimony presented by Rubicon officials also indicated that Rubicon's intent was that the policy issued by Arkwright–Boston should not provide coverage in this case. The Court believes that in reaching its decision, the Court must accept the testimony which was presented to show the intent of the parties to the insurance contract.

Thus, in summary, the Court finds that the policy issued by Arkwright–Boston to Rubicon is clear and unambiguous and excludes coverage for the claims sought herein. In the alternative, even should the Court determine that the language in the insurance contract issued by Arkwright–Boston is ambiguous and, therefore, the intent of the parties cannot be ascertained from the document itself, the Court finds that based on the evidence presented at the trial, the parties clearly intended that there be no insurance coverage for the claim sought to be recovered by Rubicon in this case.

Because the Court has ruled that there is no insurance coverage provided by the insurance contract issued by Arkwright–Boston in this case and, therefore, plaintiff's suit should be dismissed, it is not necessary for the Court to consider the remaining issues in this case.

Therefore, for the reasons set forth above, judgment shall be entered in favor of defendant, Arkwright–Boston, and against the plaintiff, Rubicon, dismissing plaintiff's suit with prejudice at its cost.

Judgment shall be entered accordingly.