**INSURANCE COMPANY OF NORTH AMERICA**

v.

**JOHN J. BORDLEE CONTRACTORS, et al. (And Consolidated Cases).**

**Civ. A. Nos. 80–754, 80–892, 80–1138, 80–2197, 80–2219, 80–2276 and 80–4776.**

United States District Court, E. D. Louisiana.

May 24, 1982.

See also D.C., 532 F.Supp. 774.

J. Y. Gilmore of Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger, New Orleans, La., for Underwriters at Lloyd's.

Cliffe E. Laborde and Gerard T. Gelpi of Gelpi, Sullivan, Carroll & Laborde, New Orleans, La., for John J. Bordlee and John J. Bordlee Contractors.

Thomas J. Grace of Courtenay, Forstall & Grace, New Orleans, La., for Twin City Barge Line.

Joseph P. Tynan of Burke & Mayer, New Orleans, La., for Bd. of Com'rs of Port of New Orleans.

Ralph E. Smith of Deutsch, Kerrigan & Stiles, New Orleans, La., for Van Reekum Paper Co.

Rufus Harris, III of Terriberry, Carroll, Yancey & Farrell, New Orleans, La., for Ins. Co. of North America.

Richard B. Foster and Bettye A. Barrios of Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, La., for Coscol Petroleum Corp.

Donald A. Hoffman and Robert I. Siegel of Camp, Carmouche, Palmer, Barsh & Hunter, New Orleans, La., for Ins. Co. of North America and Allstate Ins. Co.

George W. Healy, III, and Clayton G. Ramsey of Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Atlantic Marine Transport, Inc.

Robert M. Contois of Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for American Commercial Barge Lines.

Nigel E. Rafferty of Monroe & Lemann, New Orleans, La., for Southern American Ins. Co.

James A. Cobb, Jr. of Francis Emmett, New Orleans, La., for St. Paul Fire & Marine Ins. Co.

CHARLES SCHWARTZ, Jr., District Judge.

Subsequent to the Court's decision herein on February 18, 1982, 532 F.Supp. 774, various claims were raised as to the ultimate question of liability and coverage provided under the primary protection and indemnity policy and excess liability policy issued to John J. Bordlee Contractors, Inc.[1] This matter was reopened for the limited purpose of deciding such claims. Extensive and well-briefed memoranda were submitted and a hearing held on April 28, 1982, at which no new evidence was adduced, but the Court heard the arguments of counsel and the matter was taken under submission. After a review of the arguments and the memoranda the Court concludes:

*Protection & Indemnity Policy*

Policy AMW–1274 was issued to John J. Bordlee Contractors, Inc. (Bordlee) by the Insurance Company of North America (INA) and Allstate Insurance Company

---

1. See Order of March 29, 1982.

(Allstate). The insurers did not decline coverage under this policy and, as stated in the Court's opinion of February 18, 1982, "any coverage afforded by that policy is in full force and effect." The issue is the extent of the "coverage afforded" by this policy; specifically, whether the policy provides excess collision and tower's liability and whether the seaworthiness exclusion in the hull policy issued to Bordlee (AMW–1273) exists by implication in the Protection & Indemnity (P&I) policy.

An endorsement to the P&I policy provides:

"Notwithstanding anything contained herein to the contrary, it is understood and agreed that as respects the above vessels, this policy provides Excess Collision and Towers Liability, as provided by lines 78 through 111 of the American Institute Tug Form (2/1/76) 53R–1."

INA and Allstate contend that this endorsement only provides excess coverage to the hull policy and that since the Court found that no coverage existed under the hull policy, no coverage for collision and tower's liability should exist under the P&I policy. Bordlee argues that the P&I policy provides coverage not only for those losses not traditionally covered by hull insurance but also some risks that *are* specifically covered by the standard hull policy; in this case, collision and tower's liability.

 Historically, P&I policies were issued by clubs of shipowners to insure against risks for which they could not obtain commercial coverage; the policies generally exempt from coverage those claims payable under standard hull policies. *Seaboard Shipping Corp. v. Jocharanne Tugboat Corp.*, 461 F.2d 500 (2nd Cir. 1972). But there is no reason why an insurer and insured cannot agree that there may be hull coverage in a protection and indemnity policy. It is well settled that a contract of insurance is a law between the parties. It is a voluntary agreement and the parties may incorporate therein such provisions and conditions as they see fit. *Rubicon Chemicals, Inc. v. Arkwright-Boston Mfrs.*, 501 F.Supp. 1213 (M.D.La.1980). Regardless of

the name by which the policy is called, whether hull insurance or protection and indemnity insurance, one must look to the provisions and conditions that comprise the policy to determine what risks the insurer undertook to insure. *Greater New Orleans Expressway Com'n. v. Tug Claribel*, 222 F.Supp. 521 (E.D.La.1963).

 It is apparent to the Court that the P&I policy issued to Bordlee intended to provide excess collision and tower's liability to a limited extent; Bordlee was, in essence, purchasing "extra protection" to the collision and tower's liability included in the hull policy by way of an endorsement that provides *excess* collision and tower's liability in the P&I policy. But the mere inclusion of this additional coverage did not transform the endorsement into a protection and indemnity policy. The coverage remained hull coverage, subject to those warranties implied by law.

 The Court finds, notwithstanding the fact that there may be an amendment to a P&I policy by an endorsement which modifies the policy to include hull coverage in a P&I policy to a limited extent, in this case such an endorsement is ineffective where an implied negative, or modified warranty of seaworthiness has been breached. This warranty of seaworthiness may be implied in every hull policy of insurance unless expressly waived. *Texaco, Inc. v. Universal Marine, Inc.*, 400 F.Supp. 311 (E.D.La.1975). *Lemar Towing, Inc. v. Fireman's Fund Insurance Co.*, 352 F.Supp. 652 (E.D.La.1972), *Saskatchewan Government Insurance Office v. Spot Pack*, 242 F.2d 385 (5th Cir. 1957). The implied negative warranty is a continuing obligation that "the owner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition." *Saskatchewan Government Insurance Office v. Spot Pack*, supra, at 388. In our opinion of February 18, 1982 we held that Mr. Bordlee, as representative of the assured, did not exercise due diligence to maintain the vessel in a seaworthy condition after the attachment of the hull policy, that the unsea-

worthy condition that was created was a proximate cause of the collision of December 19, 1979 and therefore, the hull policy did not provide coverage.

▉▉▉ Bordlee cannot escape the warranty of seaworthiness implied by law in hull policies of insurance, regardless of where they are written, with what policy they are included, and by what name they are called. The P&I policy was amended to include excess collision and tower's liability. It did not expressly waive the warranty of seaworthiness and Bordlee cannot except itself from its duty simply by camouflaging its responsibilities under a hull policy in a P&I policy. The duty was owed; the duty was breached. Because of the failure of the insured to use due diligence to maintain the vessel in a seaworthy condition, the Court holds that the endorsement providing excess collision and tower's liability coverage in the P&I policy is inoperable and does not provide coverage for excess collision and tower's liability.

▉▉▉ However, a breach of the implied warranty after the policy has attached does not avoid the policy altogether and "only exonerates the underwriter for loss or damage proximately caused by the unseaworthy condition." *Lemar Towing, Inc. v. Fireman's Fund Insurance Co.*, supra, at 660. Since the warranty of seaworthiness attached only to that portion of the P&I policy providing hull coverage, it is only the endorsement that falls. The coverage provided by the P&I policy outside of the endorsement is not affected by any breach of implied warranty and is in effect; particularly, the damage claimed by the Board of Commissioners for the Port of New Orleans is covered under the P&I policy.

*Excess Liability Policy*

Southern American Insurance Company (Southern) issued Policy No. GM 501830 to Bordlee, which policy was to provide excess coverage in the following areas: Protection and Indemnity; Collision Liability; and Collision, including Tower's Liability. The issue which requires clarification is whether the excess policy incorporates by reference the primary hull and protection and indemnity policies which are involved in this matter.

In resolving this issue, the Court looks to La.R.S. 22:628 which is often referred to as the "entire contract policy statute." [2] The pertinent provisions in the current statute are as follows:

"No agreement in conflict with, modifying, or extending the coverage of any contract of insurance shall be valid unless it is in writing and physically made a part of the policy or other written evidence of insurance, or it is incorporated in the policy or other written evidence of insurance by specific reference to another policy or written evidence of insurance.

The provisions of this Section shall apply where a policy or other written evidence of insurance is coupled by specific reference with another policy or written evidence of insurance in existence as of the effective date hereof or issued thereafter...."

▉▉ The problem in determining whether incorporation by reference has been achieved lies in defining "specific reference." Bordlee argues that the excess policy issued by Southern does *not* incorporate the primary policies by reference as there is no language that the excess policy is "subject to the same warranties, terms and conditions" contained in the primary policies, citing *Scarborough v. Northern Assurance*

2. This statute has seen a number of revisions in the last few years; one of the most recent amendments came in response to the Louisiana Supreme Court's holding in *Spain v. Travelers Insurance Company*, 332 So.2d 827 (La.1976) which interpreted Section 628 as requiring that the primary policy be physically attached to the excess policy for any exclusion in the primary policy to apply. The Louisiana legislature overruled the *Spain* holding in 1976 by specifically exempting excess and reinsurance policies from the requirement of physical attachment. Section 628 was again amended in 1977 to delete the specific reference; the section now appears to permit modification of all policies by specific reference to other policies of insurance.

*Co. of America,* 514 F.Supp. 337 (E.D.La. 1981). But *Scarborough* does not require that this exact language be evident on the face of an excess policy in order to achieve incorporation by reference, and the Court does not read *Scarborough* as so holding. In fact, another court has held that incorporation by reference is effected by use of the following phrase: "the provisions of the immediate underlying policy are incorporated as a part of this policy." *Hunter v. Office of Health Services,* 385 So.2d 928 (La.App. 2d Cir. 1980). Southern's argument is that the excess policy *did* incorporate the underlying primary policies and that the excess policy is based on the terms and conditions of the primary policies. Bordlee contends that the excess policy provisions are ambiguous and asks the Court to construe any ambiguity against the insurer, citing the general rule that an ambiguous policy is to be construed against the insurer. This rule is apt when the insured is an innocent and naive party unfamiliar with the insurance field. But where the insured is a corporation, as here, represented by counsel on the same professional level as the counsel for insurers, then ambiguous provisions should not be construed strictly *against* the insurer, but should be construed *in favor* of what reason and probability dictate was intended by the parties with respect to coverage. *Eagle Leasing Corp. v. Hartford Fire Ins. Co.,* 540 F.2d 1257 (5th Cir. 1976). Bordlee argues that the excess policy is ambiguous in that it does not specifically refer to any underlying primary policy; rather, the excess policy seeks to incorporate the primary policies by the words "and as per primary policies" on the first page of the policy. Bordlee also contends that an asterisk placed next to a column heading in the Schedule of Underlying Insurances is only meant to refer to the primary limits and that it is not a designation or specific reference to the primary policies. Were the Court to accept these arguments, the excess policy would become, in effect, an all-risk policy since it would not be guided by the provisions of any underlying primary policies.

 The Court believes that the words "and as per primary policies" indicate that the primary policies issued to Bordlee form the basis for the terms of the excess policy. This is supported by the listing of insurance policies in the Schedule of Underlying Insurances under Column B, which column lists primary limits of $250,000 on each of the Bordlee tugs covered. The asterisk referred to above is placed next to the column heading and refers the reader to two lines at the bottom of the Schedule which list the number, broker and insurer of those primary limits: "As per primary policy numbers AMW 1273 (Hull) and AMW 1274 (P&I)—Armistead Miller Wallace—(50% INA and 50% Allstate Ins. Co.)." The Court cannot accept Bordlee's argument that these lines only refer to the primary limits. The policy provisions themselves (Paragraphs 2a, 2b and 2c) provide that Southern will indemnify Bordlee for all liability insured against under the respective policies described in the Schedule of Underlying Insurances listed in Column B. The Schedule specifically refers to both the primary hull and primary P&I policies issued to Bordlee.

 Insurance contracts are to be construed as a whole. Labels and headings in respective sections of the contract and the placement of the sections of the contract are pertinent to the inquiry of coverage, but one section or its placement is not to be construed separately and at the expense of disregarding other sections or placements. *Benton Casing Service, Inc. v. Avemco Ins.,* 379 So.2d 225 (La.1979). Construing the excess policy written by Southern as a whole can only lead to one reasonable and probable conclusion: the excess policy was written with the primary policies in mind and is based on the terms and conditions of the primary policies.[3]

---

**3.** Of particular application is the following language from Judge Wisdom's opinion in *Eagle Leasing Corp. v. Hartford Ins. Co.,* supra at 1261: "... the policy provisions should be construed to give a reasonable meaning that most closely reflects the probable intentions of the parties to the insurance contract. 'It is thought, too, that unless the language is so

Holding as we do that the excess policy incorporates by reference the underlying primary hull and P&I policies, we must determine the extent of the excess coverage.

As there is no liability under the primary hull policy due to the applicability of the seaworthiness exclusion in that policy, there is likewise no liability under the excess hull policy which incorporates by reference the primary hull policy. Since we hold that the implied warranty of seaworthiness was breached as to the collision and tower's liability provision in the primary P&I policy, thus affording no coverage under that provision, there is also no coverage under the excess P&I policy for collision and tower's liability. As the remainder of the primary P&I policy was unaffected by the implied warranty of seaworthiness, the portion of the P&I policy was in effect and to the same extent, there is excess P&I coverage.

Counsel are hereby ordered to appear at 5:00 P.M. on June 3, 1982, in chambers, Room C–255, 500 Camp Street, New Orleans, Louisiana, for the purpose of preparing and submitting to the Court a revised interlocutory decree in accordance with the Court's order rendered herein. This conference will not be required if such interlocutory decree is submitted on or prior to such date.

clear and strong as to prevent such a construction, the contract should be interpreted not only so that it may stand, but that it may stand as a reasonably practicable commercial undertaking: that is, of two possible constructions, that which is most reasonable from a business point of view should be taken.' 9 *Arnould*, Marine Insurance Section 105, p. 88 (1961 Ed.)."