**INDUSTRIAL RISK INSURERS, an Association of Capital Stock Companies Consisting of: the Aetna Casualty & Surety Company, et al.**

v.

**NEW ORLEANS PUBLIC SERVICE, INC., et al.**

Civ. A. No. 81–2635.

United States District Court, E.D. Louisiana.

June 30, 1987.

Fred L. Herman, David K. Fox, New Orleans, La., for Industrial Risk Insurers.

Robert N. Ryan, P. Albert Bienvenu, New Orleans, La., for intervenor.

Joseph W. Rausch, Dermot S. McGlinchey, McGlinchey, Stafford, Mintz, Cellini & Lang, William V. Dalferes, Jr., Eve B. Masinter, Robert E. Leake, Jr., George D. Fagan, New Orleans, La., for New Orleans Public Service, Inc.

## MEMORANDUM OPINION

MENTZ, District Judge.

This matter came on for bench trial on April 7, 1986. At issue is whether third-party plaintiff, the City of New Orleans (City) has insurance coverage for the alleged negligent acts of the New Orleans Fire Department (NOFD) under a primary and two excess general liability policies issued by its insurers, the third-party defendants, Southern American Insurance Company (Southern American), American Universal Insurance Company (American Universal), and National Union Fire Insurance Company (National Union). The plaintiff herein, Industrial Risk Insurers (Industrial Risk), adopted the contentions of the City. With the consent of all parties, Industrial Risk presented additional argument against the third-party defendants pursuant to the Louisiana Direct Action Statute, La.R.S. 22:655.

By stipulation of the parties, this matter was submitted to the Court on exhibits and depositions without live testimony. The parties have agreed as to the authenticity of the documents, but not as to their materiality, relevancy, construction or admissibility.

Considering the briefs submitted by counsel, the evidence, the pleadings and the applicable law, the Court makes the following findings of fact and conclusions of law. To the extent that any of the factual findings constitute legal conclusions, they are adopted as such; to the extent that any of the conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

1. On July 7, 1980, at approximately midnight, or shortly thereafter on July 8, 1980, a fire occurred on property located in New Orleans, Louisiana, owned by American Standard, Inc., and insured by Industrial Risk.

2. Industrial Risk brought suit against New Orleans Public Service, Inc., the City of New Orleans, the New Orleans Fire Department and the Sewerage and Water Board of New Orleans for $70,000,000 dollars on a partial subrogation claim arising out of the alleged failure of the NOFD to properly fight the fire at the American Standard facility.

3. The City filed a third-party demand for indemnity against its primary and excess insurers at the time of the fire, Southern American, National Union, and American Universal, alleging that these insurers provided coverage for liability on the part of its Fire Department for the alleged failure to properly fight the fire at the American Standard facility.

4. On July 7 and 8, 1980, the City had in effect the following policies: (a) Southern American policy number SL 605 750; (b) American Universal policy number AXTPL 5416; and (c) National Union policy number CE 115 78 62.

5. Southern American policy number SL 605 750 provided primary coverage of $300,000 per occurrence effective September 15, 1979 through September 15, 1980, and provided only the coverage specified on the declarations page. This page limited the Southern American policy to three types of coverage [1]: (a) Contractual Liability Insurance; (b) Manufacturer's and Con-

---

1. Item 3 of the declarations page of the Southern American policy number SL 605 750 provided:

The insurance afforded is only with respect to the coverage part(s) indicated below by specific premium charge(s) and attached to and forming a part of this policy.

tractor's Liability Insurance (M & C); and (c) Owner's, Landlord's and Tenant's Liability Insurance (OL & T). The Southern American policy does not provide comprehensive general liability insurance.

The coverage part for contractual liability insurance states that it applies to "contractual liability assumed by [the insured] under a contract designated in the schedule for this insurance." There is no contract whereby the City agreed to assume liability for the activities of the NOFD and none is designated in the schedule for contractual liability insurance. Plaintiff does not assert coverage under this insurance.

The OL & T liability insurance states that it provides coverage for liability arising out of the ownership, maintenance, or use of the insured premises which are listed in the policy as scheduled locations. The alleged liability of the City in the instant case does not arise out of the City's ownership, maintenance or use of the premises designated in the schedule for OL & T liability insurance. Rather, the risk arose from activities of the NOFD on non-scheduled premises, the American Standard plant.

The coverage part for M & C liability insurance entitled, "Coverage for Premises and the Named Insured's Operations in Progress," provides for liability coverage for property damage or bodily injury caused by specific activities or operations of the insured which are listed on the schedule as covered activities or operations.

6. The American Universal policy number AXTPL 5416 provided $700,000 dollars in excess coverage over the Southern American primary coverage, effective September 15, 1979 through September 15, 1980. The American Universal policy was a "following form" policy, which means that it provided coverage in accordance with the terms and provisions of the Southern American primary policy.

7. The National Union policy number CE 115 78 62, also a following form policy, provided a second layer of excess insurance for $2,000,000 dollars over the $1,000,000 dollars in coverage provided by the Southern American and American Universal poli-

cies. The second layer of excess insurance was obtained five months after the primary and first layer of excess insurance and was effective February 6, 1980 through September 15, 1980. On July 7, 1980, the National Union policy limit was increased from $2,000,000 dollars to $24,000,000 dollars. The terms and conditions of the policy remained unchanged.

8. There is no real issue in this case concerning whether the contractual liability and the OL & T liability insurance portions of the policy provide coverage for the activities of the NOFD. The sole question is whether the M & C liability insurance portion of the policy provides coverage for the activities of the NOFD.

9. The City argues that the policies in question provide coverage for the activities of the NOFD. Specifically, the City argues that the NOFD personnel should be classified as "municipal employees," which is the first category of covered hazards on the M & C liability insurance schedule. The insurers argue that the policy, by its terms, does not provide such coverage and that, for purposes of clarification, the policy expressly excluded from coverage the acts and omissions of the NOFD through an endorsement to the policy. Alternatively, the insurers argue that any expression of such coverage contained in the policy is the product of a mutual mistake or error of the parties and therefore, the policy should be reformed to reflect the actual intent of the parties not to provide coverage for the activities of the NOFD.

10. During the period of time in question (1978–1980), the Laurance Eustis Insurance Agency (Eustis Agency) was the insurance agent for the City. Thomas J. McMahon is the Vice-President and Laurance Eustis is the President of the Eustis Agency. Eustis was a member of the Insurance Advisory Committee of the City at various times for a total of 25 years, including the years 1978 through 1980.

11. McMahon and Eustis placed insurance for the City based on recommendations of the Insurance Advisory Committee of the City. At various times, they also discussed the City's insurance coverage

with Reynard J. Rochon, the Chief Administrative Officer for the City; Leroy Aucoin, the Assistant Chief Administrative Officer; Don Hoffman, the City Attorney; and Eileen Barras, of the City's Purchasing Department, who handled the insurance program for the City on a daily basis.

12. In 1978, the City obtained a primary policy (number SL 605 733) of liability insurance from Southern American for the policy period of September 15, 1978 through September 15, 1979. The 1978–1979 policy did not provide coverage for NOFD activities or OL & T liability insurance for NOFD premises. The policy provided that the "usual municipality risk—this involves premises coverage for the OL & T only ... coverage will *not* be included for the Police Department, Sewer and Water Board, Superdome, ... or Fire Department."

13. The Southern American policy number SL 605 733 was renewed in 1979. In the summer of 1979, McMahon and Eustis met with Rochon, Aucoin and Hoffman to discuss renewal of the Southern American policy number SL 605 733. Liability for the activities of the police and fire departments was discussed at the meeting. McMahon testified that the City Attorney felt that any claims that arose out of the activities of the fire department ought to be handled by the City Attorney's Office. It was decided at the meeting that the activities of the police and fire departments were not to be covered. However, the City instructed the Eustis Agency to extend the OL & T coverage to include all police and fire stations for the reason that a number of people enter those premises for purposes such as vaccinations, voting, and visiting. The addition of police and fire stations to the schedule of other City premises covered under the OL & T insurance was the only change in the renewal policy which repeated in substance the terms of the policy from the preceding year.

14. Eustis testified that Southern American policy No. 605 750 was to be a renewal of the previous policy. He also testified that the Insurance Advisory Committee never recommended coverage for the activities of the NOFD and the City never placed an order for such coverage. As President of the Eustis Agency and member of the Insurance Advisory Committee, Eustis' testimony about these facts is highly credible. Likewise, McMahon, the representative of the City's insurance agent who procured the policy, testified that the City never requested the Eustis Agency to obtain coverage for the activities of the NOFD, that it was not the intent of the City to obtain such coverage, and that the policy did not provide such coverage.

15. On various occasions prior to the policy period, McMahon and Eustis wrote to the City to confirm that there would be no coverage for NOFD activities.

16. On July 17, 1979, McMahon wrote Barras asking for confirmation that the Eustis Agency was "not to include Police Stations and Fire Stations in the City's General Liability Schedule." McMahon's letter was given to Hoffman for approval.

17. In a letter dated September 4, 1979, Eustis advised Rochon that the addition of police and fire stations to the policy schedule would provide coverage "applicable only to third party response and will not provide any response for the activities of either of these departments."

18. On September 13, 1979, McMahon wrote Barras confirming the inclusion of "all City Fire and Police Stations on the schedule but for third party response only and we are to exclude police and fire activities as before."

19. Barras testified that she understood that the liability insurance did not insure the activities of the NOFD.

20. McMahon contacted James Aiken, President of Loveless & Company, agent for Southern American, as well as Robin Smith, a former employee of Loveless, to renew the City's limited liability insurance. Loveless agreed to renew the Southern American policy with the same terms and conditions, except that the policy would be extended to include the police and fire stations within the OL & T schedule. Police stations were included as Schedule 18 and fire stations were included as Schedule 19.

21. The Eustis Agency did not request Loveless to issue or procure primary or excess coverage for the activities of the NOFD, nor did the Eustis Agency request premium quotes for such coverage. Eustis testified that it was not his intention to change the scope of the City's coverage to include the off-premises activities of the NOFD. Aiken and Smith testified that there was never any intent on the part of Loveless to provide primary or excess insurance for the activities of the NOFD. Aiken testified that Southern American policy No. SL 605 750 "definitely would not provide coverage" for the NOFD activities. Similarly, Eustis testified that there is no coverage under the policy for such activities.

22. Wendell Watkins, an underwriter at Loveless and Chief Operating Officer in 1979–1980, testified that there was no coverage for the activities of NOFD under the M & C liability insurance portion.

23. The Southern American primary policy included a schedule listing the operations of the City included within the M & C coverage part. The M & C schedule set out nine specific types of hazards covered. The firefighting activities of the NOFD are not specifically listed under the schedule of premises-operations hazards. The inclusion of certain specified City premises and employee operations warrants finding that the schedule does not purport to include *all* City employees.

24. Listed first on the M & C schedule was "Municipal, Township, County or State Employees" next to the code number 93111. McMahon testified that code number 93111, which is a reference to a code promulgated by the Insurance Service Organization (ISO), does not include firemen or fire departments, but refers to employees for which no separate category was available. McMahon also testified that the Insurance Service Organization provided a separate category and code for the fire department similar to other categories available for other operations such as the Parkway and Park Commission, Department of Sanitation or Department of Streets. Thus, McMahon knew what the descriptions, code numbers and premium bases set forth in the M & C schedule meant. Indeed, the Eustis Agency matched the type of employees that the City wanted covered with the correct code numbers.

25. McMahon testified that the M & C liability insurance portion of the policy did not include coverage for the activities of the NOFD.

26. Watkins corroborated McMahon's testimony that the M & C schedule did not include the activities of the NOFD. Watkins testified that code number 93111 signified municipal employees who were "not otherwise classified" and generally meant clerical employees.

27. The M & C liability insurance schedule indicates that the basis for the premium on "Municipal, Township, County or State Employees" is "the entire remuneration earned during the policy period by proprietors and by all employees of the named insured" covered by the insurance. The remuneration basis of $2,815,000 clearly could not represent the total remuneration to the City employee payroll and demonstrates that this premises/operations hazard did not include all City employee activities. Moreover, the remuneration specified for the premium basis is the identical figure set forth in the schedule for M & C liability insurance under the prior policy, which did not provide coverage for the activities of the NOFD.

28. Robin Smith of Loveless procured the first layer of excess insurance (American Universal excess policy number AXTPL 5416) from Maurice H. Saval, Inc., managing general agent for American Universal. Richard A. Bertrand, the Senior Underwriting Officer for Maurice H. Saval, Inc., testified that American Universal would not have been able to provide liability coverage for the activities or operations of the NOFD.

29. Smith procured the second layer of excess insurance (National Union excess policy number CE 115 78 62) from Merle Jones, an underwriter with National Union. Smith testified that he specifically told Jones that the only coverage for the NOFD

was the OL & T coverage for the premises only. Jones testified that there was never any intent on the part of National Union to provide coverage for the activities of the NOFD.

30. The annual premium on the expiring Southern American policy, number SL 605 733, was $90,000 dollars. The renewal policy, number SL 605 750, carried the same limits of liability and deductible ($300,000 dollars coverage per occurrence for bodily injury and property damage with $1,000 deductible per occurrence.) Seventy-six police and fire stations were added to the OL & T liability insurance schedule for an additional premium of $50.00 per location, for a total additional premium of $3,800 dollars. However, the annual premium, which included the additional schedule locations, was $84,800 dollars, $5,200 dollars less than the previous year.

31. The annual premium for the American Universal policy was $45,000 dollars, which was $7,000 dollars less than the premium for the previous year. The annual premium for the National Union policy was $20,000 dollars and the prorated premium charged to the City was $12,100 dollars. In January of 1980, the City requested McMahon to solicit quotations to raise the limits of the excess liability for City Hall, the Municipal Auditorium and the Theatre for the Performing Arts. The annual additional premium for this increase was $34,-000 dollars and the prorated premium charged the City was $6,528 dollars.

32. The primary and excess insurers based their premiums on coverage that did not include any liability for the activities of the NOFD outside its fire stations. The City did not pay a premium for insurance coverage of the activities of the NOFD. The cost of such coverage would have been at least five times the premium price actually paid by the City for the policies.

33. In 1979 McMahon requested various endorsements, including an endorsement to specifically exclude NOFD activities. That request was consistent with the correspondence between the Eustis Agency and the City wherein it was confirmed that police

and fire activities were to be excluded as on the previous policies.

34. Endorsement No. 5 to the policy was intended to clarify that NOPD and NOFD activities were not covered by the policy, but inadvertently failed to include reference to NOFD activities.

35. Endorsement No. 5 was revised to correct this error. Revised endorsement No. 5 is undated and there are no records or evidence to establish the date that it was prepared or sent to the Eustis Agency.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the subject matter under 28 U.S.C. § 1332.

2. Louisiana law governs the substantive insurance issues in this case.

3. The intent of the parties to the insurance contract is of paramount importance in interpretation of the contract. La.Civ. Code art. 2045; *Travelers Insurance Company v. Brown*, 338 F.2d 229, 237 (5th Cir.1964).

4. A plain and unambiguous insurance contract must be enforced as it is written according to the intent of the parties. La. Civ.Code art. 2046; *Gulf Building Services, Inc. v. Travelers Indemnity Company*, 435 So.2d 477, 478 (La.App.4th Cir.1983), *writ denied*, 441 So.2d 749 (La.1983); *Nunn v. Hanover Insurance Company*, 305 So.2d 676, 678 (La.App.2d Cir.1974), *writ denied*, 309 So.2d 351 (La.1975).

5. Interpretation of a contract must be made based on the "four corners" of the document itself without reference to parol evidence. *Chevron U.S.A., Inc. v. Martin Exploration Company*, 432 So.2d 886, 889 (La.App. 1st Cir.1983), *rev'd on other grounds*, 447 So.2d 469 (La.1984). However, where the intent of the parties to the contract is not adequately expressed and cannot be discovered by a study of the entire contract, the Court may consider preliminary negotiations leading to the contract and other relevant parol evidence. *Freeport Sulphur Co. v. Aetna Life Ins. Co.*, 107 F.Supp. 508, 511 (E.D.La.1952),

*modified on other grounds*, 206 F.2d 5 (5th Cir.1953).

6. Upon initial consideration, the term "municipal employees" as it is found on the M & C liability insurance schedule of hazards, would appear to include the firemen of the NOFD. In its ordinary use, the word "employee" signifies one who renders labor or services to another for salary or wages. *See Savoie v. Fireman's Fund Insurance Company*, 347 So.2d 188, 191 (La.1977). Thus, the fire department personnel who work for and are paid by the City may be considered employees of the City. However, such an insular analysis of the term "municipal employee" would violate the rule that insurance contracts must be construed as a whole. *See Insurance Company of North America v. John L. Bordlee Contractors*, 543 F.Supp. 597, 602 (E.D.La.1982), *aff'd*, 733 F.2d 1161 (5th Cir. 1984).

█ Examination of the entire M & C schedule shows that specific City premises and employee operations were listed following the "Municipal, Township, County or State Employees" hazard. Taking guidance from the maxim *inclusio unius est exclusio alterius*, the Court finds that the inclusion of specified City premises and employee operations indicates an intent that not all City premises and employee operations were covered. *See Brignac v. Pacific Mutual Life Insurance Co.*, 112 La. 574, 36 So. 595, 600 (1904).

Also, the amount of the payroll designated for "Municipal, Township, County or State Employees" in the schedule indicates that the category did not cover all City premises and employee operations. Clearly, $2,815,000 could not realistically be the total remuneration of the City employee payroll. In addition, the fact that the Southern American policy does not provide comprehensive general liability insurance and the fact that the M & C liability insurance provides coverage only for City premises and employee operations listed on the schedule establish that coverage is limited.

7. Based on the foregoing, the Court finds that the M & C liability insurance clearly did not cover all City premises and employee operations. However, whether the employees of the NOFD are "municipal employees" is a question which cannot be resolved from the four corners of the insurance contract. Although the term clearly does not emcompass all City employees, the term is nevertheless ambiguous inasmuch as it is susceptible of more than one reasonable interpretation. Exactly which City employees are included within the term "municipal employees" is indeterminable from the face of the document. Presumably, the code number "93111" delineates the term, but an explanation of the code number is not contained in the policy.

█ 8. A contract of insurance may consist of a policy and other instruments or documents incorporated therein by reference. 13A Appleman, *Insurance Law and Practice*, § 7527 (1976); *Loubat v. Audubon Life Insurance Company*, 248 La. 183, 177 So.2d 281, 285 (1965). The insurers argue that the ISO Code, which defines code number 93111, is incorporated in the policy by reference and that the Court should look to the ISO Code to give effect to code number 93111. Assuming the ISO Code were incorporated in the policy by reference, such a result would not be in conflict with LSA–R.S. 22:628 [2], because the ISO Code is purely definitional and does not conflict with, modify, or extend coverage. However, mere reference in the policy to a code number defined in an unattached and unspecified document is not sufficient to incorporate the document by reference into the insurance contract. Unlike the situation in *Wannage v. Employers Insurance of Wausau*, 386 So.2d 1076 (La. App.3d Cir.1980) and *Richards v. Farmers Export Company*, 377 So.2d 859 (La. App.4th Cir.1979), the ISO Code was not a document belonging to the City and there is no evidence that the City had possession of an ISO Code. To treat the unattached and unspecified ISO Code as incorporated

---

2. La.–R.S. 22:628 provides in pertinent part:
No agreement in conflict with, modifying or extending the coverage of any contract of

insurance shall be valid unless it is in writing and physically made a part of the policy or other written evidence of insurance ...

by reference to the Southern American policy would defeat the objective of assuring full notification to the assured of all relevant provisions of his insurance contract.

■ 10. The general rule that ambiguous provisions should be strictly construed against the insurer does not apply in this case where the insured, a large municipality, was represented by professionals, including the Insurance Advisory Committee (whose members were sophisticated in matters of insurance), the City Attorney, and an experienced insurance agent. The City stood on equal footing with its insurers and had significant input in negotiating the terms of the policy. Thus, the ambiguous provisions should be construed in favor of what reason and probability dictate was intended by the parties. *See Eagle Leasing Corporation v. Hartford Fire Ins. Co.,* 540 F.2d 1257, 1261 (5th Cir.1976), *cert. denied,* 431 U.S. 967, 97 S.Ct. 2926, 53 L.Ed.2d 1063 (1977); *John J. Bordlee Contractors,* 543 F.Supp. at 602; *Freeport Sulphur Co.,* 107 F.Supp. at 512.

11. The representatives and agents of the City fully understood and intended that the former policy (number SL 605 733) was to be renewed in its precise terms, except for the addition of the police and fire stations to the OL & T schedule of covered premises, and did not provide coverage for the activities of the NOFD. Not only did the City's insurance agent's representative possess knowledge that the policy did not provide coverage for the NOFD activities, they also communicated this information to the City in writing.

■ 12. The amount of the premium charged for the M & C liability insurance coverage is relevant in determining the scope of coverage intended by the parties since there is an obvious relationship between the risk accepted by the insurer and the amount of premium charged for the coverage. 13 Appleman, *Insurance Law and Practice,* § 7389 (1976); *Brown v. Life & Casualty Ins. Co.,* 146 So. 332, 334 (La. App.2d Cir.1933). In the case at bar, a premium for coverage of the activities of the NOFD was not charged or paid. Indeed, such a premium would have been five times greater than the premium actually charged. Thus, the amount of the premium paid for M & C liability insurance supports a finding that the parties did not intend for the "municipal employees" hazard to include the activities of the NOFD.

■ 13. The knowledge possessed by an agent is imputed to the principal even where the agent fails to convey the information to the principal. *Culver v. Culver,* 188 La. 716, 178 So. 252 (1937); *Bank of Louisiana v. Argonaut Insurance Company,* 248 So.2d 349, 352 (La.App.4th Cir. 1971).

14. The knowledge of McMahon that code number 93111 did not include the activities of the NOFD but referred to employee operations "not otherwise classified" or clerical employees is imputed to the City. Such knowledge is further evidence that the City did not intend that the M & C liability insurance provide coverage for the activities of its fire department.

■ 15. The testimony and exhibits establish that neither the City, its employees, representatives and agents, nor the agents for the primary and excess insurers intended to procure or provide coverage for the activities of the NOFD under the Southern American primary policy number SL 605 750 or the following excess policies. The testimony is undisputed that it was never the intention of any of the parties to obtain or provide coverage for the NOFD's activities. Indeed, no City representative has asserted coverage for the activities of the NOFD other than the attorneys for the City.

16. Revised endorsement No. 5, which specifically excludes the activities of the NOFD clarifies and is consistent with the intent of the parties. Accordingly, the City's argument that Revised endorsement No. 5 should not be given effect in light of the fact that it is undated, need not be addressed.

17. The M & C liability insurance portion of Southern American policy number SL 605 750 does not provide coverage for the activities of the NOFD.

18. Southern American policy number SL 605 750 does not provide coverage for the alleged negligent acts of the NOFD or for any failure by the NOFD to perform fire fighting.

19. Because the Southern American primary policy does not provide coverage for the activities of the NOFD, the following form excess policies, American Universal policy number AXTPL 5416, and National Union policy number CE 115 78 62, likewise provide no coverage.

20. Having found no coverage for the activities of the NOFD, the Court need not address the insurers' alternative arguments that firefighting is a professional service excluded by form number G-314 of the Southern American policy, that exclusion(k)(3) of the Southern American policy excluded property damage to the American Standard Plant, or that mutual error allows reformation of the policy.

Accordingly,

IT IS ORDERED that there be judgment in favor of third-party defendants, Southern American Insurance Company, American Universal Insurance Company, and National Union Fire Insurance Company, and against third-party plaintiff, the City of New Orleans, dismissing the third-party demand of the City of New Orleans.