**TEXAS EASTERN TRANSMISSION CORPORATION**

v.

**GARBER BROTHERS, INC., The M/V BLUE FIN, and Union Oil Company of California.**

Civ. A. No. 78-3490.

United States District Court, E. D. Louisiana.

July 19, 1980.

Francis Emmett and James A. Cobb, Jr., Law Offices of Francis Emmett, New Orleans, La., for Texas Eastern Transmission.

Ashton R. O'Dwyer, Jr., and Miles P. Clements, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, La., for Garber Bros., Inc.

Randall K. Theunissen, Allen, Gooch & Bourgeois, Lafayette, La., for Union Oil Co. of Cal.

Daniel A. Webb, Hebert, Abbott & Horack, New Orleans, La., for third party defendant Fluor Drilling Services, Inc.

J. Walter Ward, Jr., Christovich & Kearney, New Orleans, La., for third party defendants Jack M. Holt and Continental Ins. Co.

CHARLES SCHWARTZ, Jr., District Judge.

This suit, which arises out of damage done to an offshore pipeline, was taken under submission at the conclusion of a five day non-jury trial. Upon consideration of the record, the evidence adduced at trial, the briefs and memoranda of counsel, and the law, the Court finds as follows.[1]

1. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

In September, 1978, Texas Eastern Transmission Corporation (Texas Eastern) owned a ten and three-quarter inch pipeline, on which construction was not quite complete, in Block 280 of the West Cameron area of the Gulf of Mexico. The pipeline connected platforms B and C, both of which were owned by Union Oil Company of California (Union); platform B lay to the northeast of platform C. The pipeline was approximately 8000 feet long and at all times here relevant was neither buried nor entrenched.

In order to construct the pipeline, Texas Eastern was required to apply for a permit from the United States Army Corps of Engineers, which granted that permit on May 11, 1978. Texas Eastern was also required to obtain right of way approval from the Bureau of Land Management of the Department of the Interior. Such an application was made on March 31, 1978, and was granted on July 17, 1978. The J. Ray McDermott Company (McDermott) laid Texas Eastern's pipeline during July of 1978; Odom Offshore Services, Inc., provided surveying and other services related to the pipeline construction.

Union used its C platform for oil drilling. Fluor Drilling Services, Inc. (Fluor), conducted the drilling activity, which began after the laying of the pipeline which is the subject of this case. Fluor used the MR. GUS II, a jack-up rig, for this drilling. In order to allow the MR. GUS II to proceed with its work, it had been necessary to relocate the Texas Eastern pipeline. This relocation was undertaken in conjunction with a relocation of risers connected to the southeast corner of the C platform. A six hundred foot section of the pipeline was repositioned by McDermott's DERRICK BARGE 17, which completed that work on September 8, 1978.

Union employed Jack M. Holt, an independent contractor, as its petroleum engineer to monitor operations on C platform. He arrived at the platform on September 6, 1978. Mr. Holt also ordered supplies and equipment as a part of his duties.

The M/V BLUE FIN is a steel vessel owned and operated at all times relevant by Garber Brothers, Inc. (Garber). The BLUE FIN is 157 feet long, 36 feet broad, and twelve feet deep. Diesel engines power her twin screws, and she is fitted with anchor chains and two Danforth bow anchors, each of 1000 pounds' weight. Each anchor is raised and lowered by means of an electrically powered windlass at the bow. Union, in conjunction with its oil-drilling operations, took a time charter on the BLUE FIN to supply, among others, the MR. GUS II. The vessel first visited the MR. GUS II at the C platform location on August 20, 1978.

Around noon on September 12, 1978, the BLUE FIN arrived in the vicinity of the C platform to deliver supplies. The BLUE FIN's captain, Jesse Pierre, radioed those on the platform; he was given no specific instructions as to whether to drop anchor on one side or the other of the platform. Captain Pierre came alongside the rig at approximately 1300 hours, mooring on the east side. The vessel let out some seven or so shots of chain (one shot equals 90 feet) in the process of dropping anchor; after mooring it took in some slack on the chain. The BLUE FIN put out port and starboard stern lines.

At 1830 hours, the port stern mooring line broke and was caught in the port propeller. Captain Pierre then decided to move to the west side of the platform due to the difficulties and the rough weather conditions. He notified those on the rig of his plan and proceeded to the position at which he assumed his anchor to be directly beneath him. The crew there attempted to raise the anchor. The effort failed. The anchor would not budge, and only about ten feet of chain were taken in. The crew attempted to pull up the anchor a total of three times; there was no give after taking in the initial ten feet of chain, and each time an attempt was made to lift the anchor the windlass circuit breaker kicked out.

Captain Pierre noted in his log: "1830. While swinging around & picking up anchor to move around to west side of Rig w/o engine (stb) Hung anchor in pipeline. Hang off lines broke from Rig Port Line in wheel (Port side) sea's 4' to 6'."

At 0830 hours the next morning (September 13), divers from the DIANNE McCALL, which had been notified of the trouble, arrived and freed the BLUE FIN's port wheel. They were unable, however, to go to the bottom to inspect the anchor and determine the obstruction on which it was caught. However, the BLUE FIN once again attempted to raise its anchor at 1430 hours on September 13, and that attempt was successful.

The pipeline was inspected on September 16 and 17, 1978. Damage was noted, and a videotape of the pipeline was made on September 19. Some photographs were also taken.

Texas Eastern sued Garber, the BLUE FIN, and Union for the damage done to the pipeline. It alleged that the anchor of the BLUE FIN had caused that damage and that Union had been negligent in failing to warn the crew of the location or existence of the pipeline. Union filed a third-party complaint against Holt and his insurer, the Continental Insurance Company (Continental), claiming a duty on Holt's part to indemnify Union against plaintiff's claim. Union also filed a third-party complaint against Fluor, asserting that Fluor owed it a duty to protect plaintiff's pipeline and that Fluor should therefore indemnify Union were Union found liable. Garber filed crossclaims against Union, Holt, Continental, and Fluor. Each party denied liability to any other party.

At the conclusion of the plaintiff's case in chief, the Court dismissed all claims against Holt and Continental.

## CONCLUSIONS OF LAW

This Court has jurisdiction over the subject matter of this litigation and all parties to it. 28 U.S.C. § 1333; 46 U.S.C. § 740.

Texas Eastern, as plaintiff, must at a minimum establish by a preponderance of the evidence that the anchor of the BLUE FIN caused the damage to the pipeline which is the subject of this litigation. *Grace Line, Inc. v. United States Lines Company*, 302 F.2d 933 (2d Cir. 1962), *adopting opinion at* 193 F.Supp. 664 (S.D. N.Y.1969) (Friendly, J.), *citing Commercial Molasses Corporation v. New York Tank Barge Corporation*, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89 (1941). If evidence shows that there are other possibilities as to the cause of the damage which are equally consistent with that damage, no single one of these possibilities may be considered proved. *Dreijer v. Girod Motor Company*, 294 F.2d 549, 556 (5th Cir. 1961) (Wisdom, J.). In the instant case, Texas Eastern failed to prove by a preponderance that the alleged "collision" between its pipeline and the anchor of the BLUE FIN occurred. Professors Gilmore and Black discuss a doctrine of "inscrutable fault" in admiralty in which " 'the court can see that a fault has been committed, but is unable, from the conflict of testimony, or otherwise, to locate it.' " They note that there can logically be no liability assessed when proof of fault fails. Gilmore and Black, The Law of Admiralty (2d ed.1975) 486. In this case it is clear that the pipeline was damaged somehow, but the evidence presented leaves the Court unable to say with certainty or with any reasonable conviction that any given event or set of events caused that damage.

Five days of testimony failed to establish reliable evidence as to the sole cause of the damage sustained by the pipeline. Texas Eastern's evidence might lead one to speculate that the BLUE FIN's anchor caused the damage. However, such evidence utterly failed to obviate the fact that there was just as strong (if not stronger) a possibility that the pipeline damage was caused by others in other ways.

We note that the plaintiff had opportunity to make permanent records, through photographs or other means, of the pipeline damage and to present such data to the Court. Such data was not, however, assembled to the extent which would have been

desirable and helpful. Moreover, plaintiff had opportunity to hire an expert to inspect the damage and later testify as to his or her findings; the plaintiff in fact retained an expert only shortly before trial, long after the pipeline had been repaired and the damage was consequently no longer there to inspect.

■ While the Court does not expect and would not ask Texas Eastern to conduct its affairs at all times with an eye toward the eventuality of litigation, it cannot be denied that plaintiff's case is particularly weakened by its failure to come forward with any greater amount of evidence than it has as to the specifics of the damage actually sustained by the pipeline and to have employed an expert at or about the time it filed this complaint to examine the damaged pipeline. The longstanding rule of adverse inference provides that "when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) v. National Labor Relations Board*, 459 F.2d 1329 (D.C.Cir. 1972) (J. Skelly Wright, J.), *citing among others Armory v. Delamire*, 1 Strange 505 (1722). *See Transcontinental Gas Pipeline Corporation v. Mobile Drilling Barge*, 424 F.2d 684 (5th Cir.), *cert. denied*, 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64 (1970). We do not mean to suggest that the plaintiff willfully destroyed or withheld evidence which it possessed; we are simply dismayed that no greater effort was made to procure more compelling evidence. Garber Exhibit 7 does suggest that Texas Eastern had in its possession a great quantity if not all of the damaged pipeline.

While of course Garber, as defendant, was under no obligation to show exactly what actually caused the pipeline damage if its anchor did not, its expert Hector Pazos enumerated at least three plausible alternative possibilities. These were damage done when the D/B 17 repositioned the pipeline in early September, damage by trawlers, and damage by an anchor—of a different sort from the one carried by the BLUE FIN—carried by another vessel. Mr. Pazos testified persuasively that, in any event, the anchor of the BLUE FIN could not have inflicted the damage to the pipeline shown in the photographs offered into evidence. Neither the position of the pipeline nor the marks on it, he said in the course of a long explanation, could have been caused by the BLUE FIN's anchor. Mr. Pazos also discussed several possible reasons, other than its being fouled on the pipeline, for the failure of the BLUE FIN's anchor to come up when pulled.

Texas Eastern's expert Arthur G. Darden was offered solely in rebuttal of Mr. Pazos's testimony. Mr. Darden said little more than that he disagreed and thought that the anchor of the BLUE FIN had indeed caused the damage. Confronted with Mr. Pazos's calculations, Mr. Darden found some fault with Mr. Pazos's engineering technique, but he admitted that he had made no independent calculations. Mr. Darden further stated that he was not sure—that the damage could in fact have been caused by anything which could have moved the pipe. His opinion that the BLUE FIN's anchor would have penetrated to a depth of six to eight feet below the mud line—an opinion important to his conclusions—he characterized as "a wild estimate," "a 'guesstimate' at best."

■ Texas Eastern makes much of the fact that the BLUE FIN's Captain Pierre noted in his log that his anchor was caught on a pipeline. This, it suggests, is virtually dispositive of Garber's culpability. It is true that log entries "are certainly evidence, and cogent evidence if adverse to interest." *Slaten v. Hopemount Shipping Company*, 345 F.2d 451, 453 (5th Cir. 1965). In citing the Court to this case, however, plaintiff fails to note that it goes on to say that "we are aware of no persuasive authority or sound reason for making log entries gospel." *Id.* Plaintiff also relies heavily upon *Bunge v. Steamship UTOPIA*, 1 Fed. 892, 913 (S.D.N.Y.1880). Even if it were clear that we were compelled to follow the rule of that case from another district court in another circuit on its cen-

tennial, it does not mandate our taking Captain Pierre's log entry as fact under the circumstances of this case. The fact here is that Captain Pierre did not know and could not have known *what* the facts were when he made the notation in his log that he was stuck on a pipeline. Testimony showed that Captain Pierre's entry was in response not to any real knowledge that he had of the condition of his anchor but rather to his having just been told by those on the rig that his anchor was fouled in a pipeline.[2]

In sum, plaintiff has not demonstrated by a preponderance of the evidence that the BLUE FIN's anchor damaged its pipeline. Our finding that this is the case precludes any inquiry into shifts of burden of proof or into statutory or comparative fault.

Accordingly,

IT IS ORDERED that the Clerk enter judgment in favor of Garber Brothers, Union Oil, and third-party defendant Fluor Drilling, and against Texas Eastern at plaintiff's cost.

IT IS FURTHER ORDERED that the Clerk, in accordance with the Court's oral ruling, enter an order of involuntary dismissal insofar as pertains to all claims against third-party defendants Jack M. Holt and Continental Insurance Company.

---

**2.** It is noteworthily ironic that the first mention of a pipeline from those on the rig to Captain Pierre came only after they assumed him to be caught on it.