NATURAL GAS PIPELINE
COMPANY OF AMERICA

v.

ODOM OFFSHORE SURVEYS,
INC., et al.

Civ. A. No. 84–2451.

United States District Court,
E.D. Louisiana.

Sept. 15, 1988.

Phelps, Dunbar, Marks, Claverie & Sims, Richard N. Dicharry, Trial Atty., George W. Healy, III, New Orleans, La., Peter Connor, Lombard, Ill., for Natural Gas Pipeline Co.

Hebert, Mouledoux & Bland, Wilton E. Bland, III, Trial Atty., Andrew C. Wilson, Roch P. Poelman, New Orleans, La., for Subsea International Inc. and Ocean Boat Co.

R.K. Christovich, Christovich & Kearney, New Orleans, La., for Odom Offshore Surveys, Inc.

James R. Sutterfield, R. Joshua Koch, Jr., Trial Atty., Camp, Carmouche, Barsh, Hunter, Gray, Hoffman & Gill, New Orleans, La., for Certain Underwriters at Lloyd's.

Mathews, Atkinson, Guglielmo, Marks & Day, Thomas E. Balhoff, Baton Rouge, La., for Louisiana Ins. Guar. Ass'n.

Phelps, Dunbar, Marks, Claverie & Sims, Danny G. Shaw, T.A., Timothy E. Kelley, New Orleans, La., for Santa Fe Offshore Const. Co.

McGlinchey, Stafford, Mintz, Cellini & Lang, Michael J. Maginnis, T.A., David L. Barnett, New Orleans, La., for Nat. Union.

WICKER, District Judge.

This is a suit to recover damages to an offshore pipeline caused by the anchor of a vessel.

Plaintiff Natural Gas Pipeline Co. ["NGPL"] and its subrogated builders' risk underwriters sued the M/V MR. OFFSHORE, Ocean Boat Company ["Ocean Boat"], Subsea International ["Subsea"], and Certain Underwriters at Lloyd's, London ["Lloyd's"], the excess liability insurers of Subsea and Ocean Boat, for damage to NGPL's pipeline. Lloyd's brought a third party complaint against Santa Fe Offshore Construction Company ["Santa Fe"] for indemnity and contribution. Subsea and Ocean Boat also sought indemnity and contribution in cross claims filed against Odom Offshore Surveys, Inc. ["Odom"] and Santa Fe.

On April 15, 1986, plaintiffs settled their claims against the M/V MR. OFFSHORE, Ocean Boat, Subsea and Lloyd's for $2,570,000, reserving their rights against Odom and its underwriters. (Exhibit 31.) After settlement was reached, NGPL and its underwriters, along with Ocean Boat, Subsea and Lloyds, ["claimants"] sued Odom and its underwriters. Odom went into Chapter 11 bankruptcy. The bankruptcy stay was lifted to allow suits to be brought against Odom's insurers and Odom to the extent it had insurance coverage. Claimants filed third party claims against National Union Fire Insurance Company of Pittsburgh, Pennsylvania ["National Union"] and Louisiana Insurance Guaranty Association ["LIGA"], which had succeeded the bankrupt Mission Insurance Company. LIGA was dismissed prior to trial.

There is no dispute that the payment of the $2,570,000 settlement is a reasonable valuation of the damage sustained; nor is there any dispute that the damage was caused by the starboard stern anchor of the M/V MR. OFFSHORE.

A four day trial was held on a former date before the court sitting without a jury to determine whether Odom was liable for the pipeline damage and whether Odom has any insurance coverage for this incident.

After considering the testimony and evidence presented at trial, the briefs and arguments of counsel, and the applicable law, the court agrees with the plaintiff's contention that, on November 21, 1981, the starboard stern anchor of the M/V MR. OFFSHORE was originally dropped in the wrong place, too close to the NGPL pipeline; that misplacement of that anchor constituted negligence on the part of Odom, and proximately caused the damage to the pipeline.

The Court also agrees with the contention of National Union that its policy of insurance covering Odom contains exclusions for professional services rendered by Odom in this incident.

Accordingly, the Court issues the following findings of fact and conclusions of law.

FINDINGS OF FACT

1

On November 21, 1981, three pipelines were located in Vermilion Blocks 380–397: a twenty-four inch (24″) pipeline running north northeast/south southwest, owned by Michigan Wisconsin Pipeline Co. ["Mich–Wisc"]; one twelve inch (12″) Mich–Wisc pipeline running northwest/southeast and one twelve inch (12″) pipeline under completion also running northwest/southeast and owned by plaintiff NGPL, a wholly owned subsidiary of MidCon Corp. ["NGPL pipeline"]. Both twelve inch (12″) pipelines connected with the twenty-four inch (24″) Mich–Wisc pipeline at tap valves. (Exhibit 37.)

2

NGPL hired Santa Fe to build its pipeline. Santa Fe hired Subsea to do inspection diving services and Subsea, in turn, hired a dive boat, the M/V MR. OFFSHORE, to assist it in performing its inspection diving services.

3

The M/V MR. OFFSHORE, owned by Ocean Boat, had a four point mooring system consisting of two double-drum winches located on the stern deck immediately aft of the wheelhouse/accommodation area of the vessel, and four 5,000 pound anchors, each attached to approximately 4,000 feet of one inch (1″) steel cable. (Exhibit 12.) By means of the four point mooring system, the M/V MR. OFFSHORE could position itself directly over that area of pipeline under inspection.

4

NGPL hired Odom to survey the pipeline, to plot the pipeline and proposed anchor locations, and to guide the dive vessel over designated anchor and pipeline locations during anchoring and anchor retrieval operations. (Exhibit 27.)

5

Odom's survey party, consisting of two employees, Mr. Hugh Quarles ["Quarles"] and Mr. Paul Chamblee ["Chamblee"] and Odom's equipment which included a microcomputer, plotter, printer, CRT terminal and a Hydrotrac receiver, were aboard the M/V MR. OFFSHORE. (Exhibit 8.)

6

The Hydrotrac receiver, which calculates the vessel's position relative to the Lamber "X" and "Y" coordinates, operates on private radio stations deployed by Odom. It graphically displays the movement of the vessel through two (2) functions: Mylar—As the vessel moves, a needle marks a plastic sheet showing the location and path of the vessel in relation to the pipeline; and Silver Tape—When a manual button is pushed, the date, time and "X" and "Y" coordinates for the vessel are printed on a silver tape. All Odom's positioning equipment were maintained, installed, calibrated, adjusted and operated entirely by Odom employees. Pre-plotted locations of the pipelines and tap valve were provided by Odom's home office. (Exhibit 39A.)

7

On November 21, 1981, the M/V MR. OFFSHORE was to be moored directly over the tap valve location as the dive

platform for the Subsea divers. (Exhibit 14.) Captain Greenhalgh requested anchor locations fifteen hundred feet (1500') from the tap valve with the anchors laid at forty-five degree (45°) angles from the corners of the vessel. These locations provided at least a five hundred foot (500') buffer from each pipeline. More particularly, Captain Greenhalgh had asked that the starboard stern anchor be dropped approximately eight hundred feet (800') south of the NGPL pipeline.

8

Using a Hydrotrac unit, which had been calibrated on the morning of November 21, 1981, Chamblee and Quarles plotted the four anchor locations. (Exhibit 28.) Using Odom's positioning equipment, Quarles and Chamblee directed the Captain as he maneuvered the vessel to the four proposed anchor locations. When Odom's survey crew on board confirmed that the vessel had arrived at one of the four intended anchor locations, the Captain ordered the anchor dropped and the wire slacked.

9

After all four anchors had been dropped, the M/V MR. OFFSHORE was over the tap valve at a heading of 135 degrees and remained in that position from November 21, 1981 until 2045 hours on November 25, 1981, when Captain Greenhalgh received permission to begin retrieving the anchors because of inclement weather. (Exhibit 14.)

10

The port stern, port bow and starboard bow anchors were retrieved without incident but, after two attempts, the captain was unable to retrieve the starboard stern anchor. At 2245 hours, Captain Greenhalgh ordered the starboard stern cable cut and the anchor abandoned. (Exhibit 14.)

11

On December 4, 1981, divers confirmed that the starboard stern anchor of the M/V MR. OFFSHORE had contacted the NGPL pipeline. (Exhibit 15.) More particularly, the starboard stern anchor of the vessel was found in contact with the NGPL pipeline at a position on the south side of pipejoints 308–310. (Exhibits 44, 45 and 28.) A trench led from the location of the anchor in the pipeline down the south side of the pipeline, and then to a crater six to ten feet (6'–10') south of the pipeline. (Exhibit 45.)

12

Plaintiff sued Odom for damages based on Odom's negligence in mispositioning the anchor when it was initially dropped on November 21, 1981. Odom defended, contending that the accident had been caused by Captain Greenhalgh's negligence, in retrieving the anchors on November 25, 1981.

13

Based on the weight of the credible evidence, the court finds that the negligence of the Odom employees in directing the incorrect placement of the starboard stern anchor of the M/V MR. OFFSHORE was the proximate cause of the damages to the pipeline. It is more probable than not that the starboard stern anchor was originally dropped near the NGPL 12" pipeline, near the location at which it was discovered after the anchor cable had been cut and near the location of the damaged NGPL 12" pipeline.

14

It was established at trial that the anchor retrieval operations proceeded as follows on the night of November 25, 1981:

By slacking the anchor cables to the port and starboard bow anchors and to the starboard stern anchor and by then winching in on the cable connected to the port stern anchor, the captain moved the M/V MR. OFFSHORE to the location directly over the port stern anchor and lifted the cables vertically to retrieve the port stern anchor. He then. moved the vessel in the same manner towards the alleged position of the starboard stern anchor until he noticed that the anchor cable was coming in on the winch but the Hydrotrac showed that the vessel was not moving towards the anchor. The captain immediately slacked the starboard stern anchor cable and called Quarles and Chamblee, who were playing gin in the galley, to the bridge. Quarles and Chamblee turned on the positioning equipment and plotted the vessel north of

the NGPL pipeline, and the anchor south of the 12″ Mich–Wisc pipeline. (Exhibit 28.) However, Quarles testified that he could not be certain that the Odom Hydrotrac unit was properly calibrated because the vessel had moved from its fixed location over the tap valve.

15

After retrieving the port bow and starboard bow anchors without incident, and again relying on Odom's advice and guidance, the captain made one last effort to retrieve the anchor by pulling it to the southwest away from the NGPL pipeline. The M/V MR. OFFSHORE was headed southwest when the anchor cable to the starboard stern anchor was cut. That Chamblee's coordinates do not show that the vessel ever got to the southwest of the pipeline is not the fault of the captain. (Exhibit 28.) He was directed in his endeavor by Odom personnel and Odom equipment. Accordingly, the court finds that Odom's negligence in directing that the starboard stern anchor be dropped too close to the NGPL pipeline was the sole cause of the damage to the pipeline; Odom's contention that Captain Greenhalgh was at fault in retrieving the anchor is without merit.

16

No evidence of the exact anchor locations on November 21, 1981, was presented. The only contemporaneous record of where the starboard stern anchor had been dropped would have been the silver tape fix and original mylar resulting from placement of the anchors on November 21, 1981. Although it was Odom's practice to keep all silver tapes and original mylars for each positioning job and although these tapes were last seen in Odom's possession, none were introduced into evidence.

17

The weight of the credible evidence adduced at trial did establish, however, that the starboard stern anchor was not dragged into the pipeline during the November 25, 1981 anchor retrieval operations from a position approximately eight hundred feet (800′) south of the NGPL pipeline. It could not have dragged without leaving a trench or anchor scar on the bottom and no such evidence was introduced. (Exhibits 28 and 45). There is likewise no evidence that the M/V MR. OFFSHORE got close enough to the starboard stern anchor during retrieval operations to place the line under tension at an angle allowing it to lift vertically off the bottom.

18

Kenneth Lee Myers, an oceanographer with expertise in sidescan sonar acquisition and interpretation, and underwater video interpretation (Exhibit 43), testified that a distance of at least nine hundred twenty-five feet (925′) separated the intended anchor location and the spot where the starboard stern anchor came to rest in the NGPL pipeline. (Exhibit 44.) In order for the anchor to end in a position near enough to damage the NGPL pipeline, the starboard stern anchor would have had to have been lifted vertically off the bottom at its intended position, i.e. south of the 12″ Mich–Wisc pipeline, would have had to have travelled the nine hundred twenty-five feet (925′) to the north without touching the bottom and then would have had to have been dropped to form the crater visible on the ocean floor near the NGPL pipeline. (Testimony of Arthur Sargent).

19

Both Arthur Sargent, an expert naval architect and engineer (Exhibit 48), and Odom's expert Al H. Mousselli testified that once the starboard stern anchor was in place on the ocean bottom, it would not have lost contact with the bottom, unless the anchor cable were taut and unless the vessel were directly over the anchor. For a vessel moving at approximately one knot with its winches to generate enough force on the anchor cable to lift it vertically from the ocean bottom, the vessel would have had to have been almost directly over the anchor. (Exhibit 49. Testimony of Sargent and Mousselli.) The M/V MR. OFFSHORE's retrieval operations did not take it to within one thousand feet (1000′) of the location at which Odom said they had dropped the anchor. (Testimony of Greenhalgh and Quarles.)

Odom also contended that the vessel could not have remained over the tap valve through November 25, 1981, had Odom directed that the starboard stern anchor be dropped in the wrong location on November 21, 1981. That contention is without merit. Because the M/V MR. OFF-SHORE's starboard stern anchor was only a leeward anchor (Testimony of Captain Greenhalgh), there was sufficient holding power and tension from the windward anchors to maintain the vessel over the tap valve from November 21 to November 25, 1981. (Exhibits 50 and 14. Testimony of Sargent.)

Finally Odom's contention that the anchor dragged into the pipeline during retrieval operations on November 25, 1981, is without merit. A.C. "Ace" Forgay, an expert hydrographer (Exhibit 46), testified that the pick-up points of the two bow anchors, which are the only two anchors clearly fixed during the retrieval, establish that the anchor spread was shifted by hundreds of feet from its intended location and was consistent with the theory that the starboard stern anchor was dropped between the 12″ Mich–Wisc and NGPL lines, rather than further south of the 12″ Mich–Wisc pipeline. (Exhibits 47, 47A, 47B.)

National Union is a foreign insurer authorized to do and doing business in the State of Louisiana. It issued a contractual and comprehensive general liability policy [# S993–54–51] to Odom in Louisiana. (P. Exhibit 35.) National Union contends that the policy it issued to Odom contained exclusions for professional services and the exclusions apply to the anchor positioning services Odom performed on board the M/V MR. OFFSHORE from November 21 through November 25, 1981.

The contractual liability section of National Union's policy provides in pertinent part:

This insurance does not apply:

(a) to liability assumed by the insured under incidental contract:

(b)(1) If the insured is an architect, engineer or surveyor, to ... property damage arising out of professional services performed by such insured, including

(i) the preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs or specifications, and

(ii) supervisory, inspection or engineering services; *Id.*

National Union's policy also includes the Architects, Engineers and Surveyor's Professional. Liability exclusion which provides:

It is agreed that the insurance does not apply to ... property damage arising out of the rendering of or the failure to render any professional services by or for the named insured, including

(1) the preparation or approval of maps, plans, opinion, reports, surveys, designs or specifications and;

(2) supervisory, inspection or engineering services. *Id.*

Contrary to Odom's position, the court finds that National Union has proved by a preponderance of the evidence that the exclusions apply. At all times pertinent, Odom was performing professional surveying services to NGPL. Quarles testified that he needed to be trained as a surveyor to operate Odom's equipment. Chamblee also had special training for the tasks he performed for Odom on the M/V MR. OFFSHORE. (Exhibit 39A.) According to Quarles, neither performed any navigational function while they were on the vessel. Since the National Union comprehensive general and contractual liability insurance issued to Odom contains an endorsement which excludes coverage for property damage arising from the rendering or failure to render professional surveying services, (P. Exhibit 35), Odom's claim against National Union must be denied.

The Court finds that the exclusions contained in the National Union policy are clear and unambiguous and the caption or heading of these exclusions do not render the policy ambiguous.

The Court finds no unusual circumstances existing. Accordingly, prejudgment interest is owed from April 15, 1986, the date of settlement between claimants, at a rate of twelve percent (12%) up to and including December 31, 1987, and at nine and three quarters percent (9.75%) from January 1, 1988, until date of judgment.

CONCLUSIONS OF LAW

The court has jurisdiction over this matter under 28 U.S.C. 1333.

Plaintiff bears the burden of establishing by a preponderance of the evidence that Odom's fault caused the damage to the NGPL pipeline. *Texas Eastern Transmission v. Garber Brothers*, 494 F.Supp. 832 (E.D.La.1980), *aff'd mem.*, 677 F.2d 114 (5th Cir.1982).

Odom's failure to produce the original records of the positioning services it performed in connection with mooring the M/V MR. OFFSHORE over the NGPL tap valve creates an inference that the evidence would not be favorable to its position. *Transcontinental Gas Pipeline Co. v. Mobile Drill Barge*, 424 F.2d 684, 694 (5th Cir.), *cert. denied sub nom Ocean Drilling & Exploration Co. v. Signal Oil & Gas Co.*, 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64 (1970); *Texas Eastern Transmission*, 494 F.Supp. at 835.

The negligence of the Odom employees in directing the incorrect placement of the starboard stern anchor of the M/V MR. OFFSHORE was the proximate cause of the damage to the pipeline. *Olympic Towing Corp. v. Nebel Towing Co.*, 419 F.2d 230 (5th Cir.1969), *cert. denied*, 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396 (1970).

Louisiana law governs the interpretation of Odom's contracts of insurance. *Sprow v. Hartford Insurance Company*, 594 F.2d 418 (5th Cir.1979).

Contracts of insurance, like other contracts, must be construed according to the terms which the parties have used, to be taken and understood, in the absence of ambiguity, in their plain, ordinary and popular sense. *Calcasieu–Marine Nat. Bank, Etc. v. American Employers' Ins., Co.*, 533 F.2d 290 (5th Cir.), *cert. denied sub nom. La. Bank & Trust Company of Crowley, La. v. Employers' Liability Assurance Corp., Ltd.*, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976).

Under Louisiana law, exclusions in an insurance policy must be clearly expressed. *Calcasieu Marine*, 533 F.2d at 295; *Benton Casing Service Inc. v. Avemco Ins.*, 379 So.2d 225 (La.1979) (On Rehearing). The court finds that the National Union exclusion is clearly expressed and is unambiguous.

To circumvent the plain and unambiguous language of the professional services exclusion, plaintiffs argue that the caption or heading of an insurance exclusion is as applicable as the wording of the exclusion itself and indicated that there was jurisprudence to support this construction of an insurance contract. Upon review of the applicable law, the court does not agree.

The insuring agreement must be read together with applicable exclusions. *Southwest La. Grain v. Howard A. Duncan, Inc.*, 438 So.2d 215, 218 (La.App. 3rd Cir.), *cert denied*, 441 So.2d 1224, 442 So.2d 447 (La.1983). *Southwest*, however, does not address the role, if any, of captions or headings to an insurance exclusion.

■ Under Louisiana law, "labels and headings in respective sections of the contract are pertinent to the inquiry of coverage but one section or its placement is not to be construed separately or at the expense of disregarding other sections or placement." *Scarborough v. Travelers Insurance Co.*, 718 F.2d 702, 707 (5th Cir. 1983). The insurance contract is to be construed as a whole. *Id.* See also *Ins. Co. of North America v. John J. Bordlee Contr.*, 543 F.Supp. 597 (E.D.La.1982), *aff'd*, 733 F.2d 1161 (5th Cir.1984); *Matherne v. Hartford Ins. Co.*, 444 So.2d 146, 149 (La. App. 1st Cir.1983). These cases do not say that the caption or heading of an exclusion is as applicable as the exclusion itself in the interpretation of its meaning. Furthermore, none of these cases narrowly confine the meaning of the term "professional services" in an insurance exclusion to only those of licensed professionals. Accordingly, the court finds that the interpretation of the National Union exclusion for professional services is not restricted exclusively to its title, heading or caption.

11

The insurer has the burden of proving an exclusion to a legal certainty by a preponderance of the evidence. *Calcasieu Marine*, 533 F.2d at 295; *Myevre v. Continental Casualty Company*, 245 So.2d 785, 787 (La.App. 4th Cir.1971), citing *Givens v. Southern Farm Bureau Casualty Insurance Company*, 197 So.2d 380 (La.App. 2d Cir.1967); *Rachal v. Union National Life Insurance Company*, 184 So.2d 775 (La. App. 3rd Cir.1966).

12

In determining whether services are professional under Louisiana law, the court looks to the character of the services performed, such as whether special knowledge and technical expertise are required, rather than the title or character of the party performing the services. Acts which could have been done by an unskilled or untrained employee are not subject to a professional services exclusion. Professional services involve discretion acquired by special training and the exercise of professional judgment. *Grant v. Touro Infirmary*, 254 La. 204, 223 So.2d 148 (1969) [counting of surgical sponges by a surgical nurse was not a professional service]; *American Cas. Co. v. Hartford Ins. Co.*, 479 So.2d 577, 579 (La.App. 1st Cir.1985) [instructing person to remove shirt and place himself on examination table could be performed by unskilled, untrained employee and was not a professional service]; *Danks v. Maher*, 177 So.2d 412 (La.App. 4th Cir.1965) [counting of laparatomy squares which could be done by any untrained, unskilled employee was not a professional service]; *D'Antoni v. Sara Mayo Hospital*, 144 So.2d 643 (La. App. 4th Cir.1962) [raising of bed side rail was a purely mechanical act that could be performed by any unskilled person].

13

■ In this case, the basis of liability asserted by the plaintiffs is the survey crew's failure to render accurate opinions in the course of their employment with Odom as offshore survey crewmen. Apart from their titles, the opinions given by the Odom survey crew were derived from technical knowledge and expertise necessary to operate the Odom survey equipment and to interpret data generated by that equipment. In directing the M/V MR. OFFSHORE to designated proposed anchor locations, Quarles and Chamblee were required to exercise professional judgment, derived from special training. Accordingly, the court finds as a matter of law that the services rendered by the Odom survey crew on board the M/V MR. OFFSHORE were professional services within the meaning of National Union's exclusions. *Womack v. Travelers Insurance Co.*, 251 So.2d 463 (La.App. 1st Cir.1971). Compare *Gregoire v. AFB Construction Inc.*, 478 So.2d 538 (La.App. 1st Cir.1985) [liberal interpretation of the allegation that the insured engineering firm knew of the danger but allowed the project to proceed involves more than the rendering of professional services.]

14

The court having found that the National Union comprehensive general and contrac-

tual liability insurance excludes coverage for property damage arising from the rendering or failure to render professional services, and having found that the exclusion as clear and unambiguous, the court holds as a matter of law that the exclusion must be given effect. *Smith v. Western Preferred Casualty Company*, 424 So.2d 375 (La.App. 2d Cir.1982); *Superior Steel, Inc. v. Bituminous Casualty Corp.*, 415 So.2d 354 (La.App. 1st Cir.1982).

15

"[P]rejudgment interest in actions under the general maritime law is the rule rather than the exception; prejudgment interest must be awarded unless unusual circumstances make an award inequitable." *Ryan Walsh Stevedoring Co. v. James Marine Services, Inc.*, 792 F.2d 489, 492 (5th Cir.1986). See also *Inland Oil and Transport Co. v. Ark–White Towing*, 696 F.2d 321 (5th Cir.1983); *Todd Shipyards Corp. v. Turbine Service, Inc.*, 674 F.2d 401 (5th Cir.1982), *cert. denied sub nom Sentry Ins. v. Todd Shipyards Corp.*, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982); *Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724 (5th Cir.1980); *Mecom v. Levingston Shipbuilding Co.*, 622 F.2d 1209 (5th Cir.1980); *American Zinc Co. v. Foster*, 441 F.2d 1100 (5th Cir.), *cert. denied*, 404 U.S. 855, 92 S.Ct. 99, 30 L.Ed.2d 95 (1971).

16

■ Since prejudgment interest is compensation for the use of funds wrongfully withheld, admiralty courts have discretion in determining the proper prejudgment interest rate. *Platoro Ltd., Inc. v. Unidentified Remains, Etc.*, 695 F.2d 893, 906–907 (5th Cir.), *cert. denied sub nom. Texas v. Platoro Limited, Inc.*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). In setting the rate of prejudgment interest, admiralty courts may be guided by, but they are not bound by, state law. *Todd Shipyards Corp. v. Turbine Service, Inc.*, 592 F.Supp. 380, 384 (E.D.La.1984), *remanded on other grounds*, 763 F.2d 745 (5th Cir.1985); *In Re M/V Vulcan*, 553 F.2d 489, 491 (5th Cir.), *cert. denied sub nom. Sabine Towing & Transp. Co., Inc.*

*v. Zapata Ugland Drilling, Inc.*, 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977); *Gator Marine Serv., Etc. v. J. Ray McDermott & Co.*, 651 F.2d 1096, 1101 (5th Cir. 1981).

17

■ La.C.C. art. 2924 provided for an interest rate of twelve percent (12%) through the calendar year of 1987. For 1988, the legal interest rate in Louisiana under La.C.C. art. 2924 is nine and three quarters percent (9.75%). The court finds these interest factors are fair.

Because of the foregoing, claimants are awarded damages in the amount of the settlement ($2,570,000) against Odom with prejudgment interest of twelve (12%) to run from April 15, 1986, through December 31, 1987, and with prejudgment interest of nine and three quarter percent (9.75%) to run from January 1, 1988 through this date. National Union is not responsible for the damages awarded against Odom because of the policy exclusions for professional services.

Let judgment be entered accordingly.